**UNITED STATES of America,**
**Appellant,**

v.

**Nicholas ALBERTI, Appellee.**

**No. 890, Docket 76–1543.**

United States Court of Appeals,
Second Circuit.

Argued March 17, 1977.

Decided Aug. 24, 1977.

Rehearing Denied Oct. 11, 1977.

---

count indictment. A threshold question is whether this appeal is authorized by § 3731, as a matter of both statutory interpretation and constitutional law. We hold that we lack appellate jurisdiction to review that part of the order which granted a new trial and therefore we dismiss the appeal to that extent. With respect to that part of the order which struck portions of the indictment, we hold that we have jurisdiction under § 3731 to review it and, as to that part of the order, we reverse and direct that the new trial proceed on the unexpurgated indictment.

### I. PRIOR PROCEEDINGS

In a single count indictment returned February 12, 1975 Nicholas Alberti was charged with knowingly making false material declarations under oath before a grand jury in violation of 18 U.S.C. § 1623 (1970). At the five day trial in June 1976 the government's evidence showed that Alberti appeared as a witness before a grand jury in the Western District of New York on October 16, 1974. He had been granted immunity. The grand jury was investigating alleged illegal gambling, loansharking, and racketeering in violation of 18 U.S.C. §§ 1955 et seq., and 1961 et seq. (1970). It was material to the grand jury investigation to determine whether a card game known as "ziganette" (or "siginete") took place regularly at Nairy's Social Club in Buffalo; whether large sums of money were wagered during that game; and whether certain persons received a percentage of the wagers. Alberti's allegedly false testimony before the grand jury in response to various questions concerning the above subjects formed the basis of the government's charge of perjury. Essentially, Alberti denied having knowledge that the game of ziganette was played at Nairy's, knowledge that one Michael Bona was connected with the game, and knowledge of the identities of other dealers and the percentage of wagers taken as the house share.[1]

Katherine Winfree, Atty., Dept. of Justice, Washington, D. C. (Richard J. Arcara, U. S. Atty., Buffalo, N. Y., and Jerome M. Feit, Atty., Dept. of Justice, Washington, D. C., on the brief), for appellant.

Brian F. Toohey, Buffalo, N. Y., for appellee.

Before LUMBARD and TIMBERS, Circuit Judges, and DAVIS,* Court of Claims Judge.

TIMBERS, Circuit Judge:

The United States appeals, pursuant to 18 U.S.C. § 3731 (1970), from an order entered in the Western District of New York, John T. Curtin, *Chief Judge*, after the jury had convicted defendant of perjury, granting him a new trial and, for purposes of the new trial, striking portions of the single

* Hon. Oscar H. Davis, Judge, United States Court of Claims, sitting by designation.

1. See note 3 *infra*.

On Friday, June 11, 1976, at the close of all of the evidence, defense counsel moved for a judgment of acquittal. He claimed that the evidence adduced at trial was insufficient, and that the questioning before the grand jury was too ambiguous and imprecise, to support a perjury conviction. Decision on the motion was reserved. Both sides completed their summations Friday afternoon and the jurors were sent home for the weekend, to return the following Monday for the charge and deliberations.

The Friday evening edition of the Buffalo Evening News carried an article that contained unfavorable references to Alberti and connected him with the underworld and the activities at Nairy's Social Club. Defense counsel brought the article to the court's attention upon resumption of the trial on Monday, June 14. He requested first that the jurors be questioned as to whether they had seen the article, then that a mistrial be declared, and finally, after the first two requests had been denied, that the jurors be given a specific instruction about the article. The court reconsidered and agreed to conduct a voir dire. Upon the jury's return to the courtroom, however, the court proceeded with the charge and inadvertently failed to question the jurors or to give them instructions regarding the publicity. Later that day the jury returned a verdict of guilty.

On June 18 defense counsel filed his post-verdict motions. He renewed his motion for a judgment of acquittal on the same grounds of insufficiency and imprecision on which his earlier motion for acquittal had been based. He also moved in the alternative for a new trial on the ground that the newspaper publicity may have had a prejudicial effect on the jury.

After hearing arguments on July 16 and August 5 on the motions, the court filed a reasoned opinion on September 30. The court denied the motion for an acquittal on the ground that, although it found merit in certain of defendant's claims of insufficiency and imprecision, the questioning before the grand jury as reflected in certain other portions of the indictment was sufficiently precise, and the falsity of Alberti's answers was supported by sufficient evidence, to sustain the conviction. The court did grant defendant's alternative motion for a new trial on the ground of possible prejudicial publicity. For purposes of the new trial the court sua sponte struck from the indictment those specifications of perjury that it had ruled could not independently support a conviction. From the order granting a new trial and striking portions of the indictment, the United States appeals.

## II. APPELLATE JURISDICTION

■ The right of the United States to appeal from an adverse ruling in a criminal case is governed by the Criminal Appeals Act, 18 U.S.C. § 3731 (1970). See generally *United States v. Martin Linen Supply Co.,* 430 U.S. 564 (1977); *United States v. Sanges,* 144 U.S. 310 (1892). The Act was amended in 1970 as part of the Omnibus Crime Control Act, Pub.L.No. 91–644, tit. III, § 14(a), 84 Stat. 1890. Present § 3731 provides:

"In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution."

The Supreme Court has stated that "the legislative history makes it clear that Congress intended to remove all statutory barriers to government appeals and to allow appeals whenever the Constitution would permit." *United States v. Wilson,* 420 U.S. 332, 337 (1975). We therefore must determine whether the language of the statute encompasses this appeal and, if so, whether such appeal nevertheless is barred because the double jeopardy clause would prohibit further prosecution.

■ Despite the breadth of the coverage of § 3731, we hold that it does not authorize a government appeal from the order granting a new trial. Such an order does not "[dismiss] an indictment . . . as to any one or more counts . . . ." Having failed to come within this express threshold requirement of the statute, the government cannot appeal the new trial order. We therefore dismiss that part of the appeal which seeks review of the grant of a new trial.

■ For purposes of the new trial however the district court struck portions of the single count indictment. At first blush an appeal from that part of the order might appear likewise not to fall precisely within the statutory language which provides for "dismissing an indictment or information as to any one or more counts." Mindful of the Act's explicit directive that its provisions "shall be liberally construed to effectuate its purposes", we hold that § 3731 authorizes the government to appeal so much of the order as "struck" portions of the indictment.

■ The statutory language does not preclude such an interpretation. It refers to dismissal of an indictment "as to one or more counts", not to dismissal "of one or more counts of an indictment". We do not rest however on such a semantic distinction. We prefer to base our ruling on the practical result of the district court's order which

in effect has dismissed a substantial part of the single count; this amounts to dismissal of a substantial part of the indictment. In *United States v. Sanabria*, 548 F.2d 1 (1 Cir. 1976), *cert. granted*, 433 U.S. 907 (1977), the court adopted a similar construction of § 3731, interpreting the word "count" in § 3731 to include "any discrete basis for the imposition of criminal liability that is contained in the indictment". 548 F.2d at 5. Here, although the district court described its action as having "stricken" portions of the indictment, as if they were surplusage, the effect of the court's action could be the same as if a whole count had been dismissed.[2] We conclude that this part of the district court's order comes within the statute "liberally construed to effectuate its purposes."

■ This does not end our inquiry however with respect to the appealability of the striking part of the district court's order. The question remains whether the double jeopardy clause of the Fifth Amendment bars retrial on the unexpurgated indictment. We hold that it does not.

Obviously Alberti's trial has not terminated in his favor. At no time has he been acquitted by either the jury or the judge. The jury returned a verdict of guilty on the single count. The judge denied his motion for an acquittal. If it were not for the grant of a new trial, which was based on prejudicial publicity and was wholly unre-

---

2. Ordinarily the dismissal of one or more counts of an indictment terminates the prosecution as to the dismissed count or counts. Our appellate jurisdiction to review the instant order might be drawn into question on the ground that nothing has been terminated; Alberti faces a new trial on the single count on which he was indicted. We find this unpersuasive. The original Senate bill amending the Criminal Appeals Act authorized the government to appeal from any decision or order "terminating a prosecution" in favor of a defendant as to any one or more counts. See *United States v. Wilson, supra,* 420 U.S. at 338. The language about "terminating" a prosecution was eliminated by the Conference Committee without explanation. "In place of that provision, the Committee substituted the

language that was ultimately enacted . . . ." *Id.* In *Wilson*, the Court concluded that "it seems inescapable that Congress was determined to avoid creating nonconstitutional bars to the Government's right to appeal." *Id.* at 339. Surely it is not for us to interpose a barrier that seems to have been rejected explicitly by Congress and which would frustrate the purposes of the Act.

As far as the interlocutory nature of the instant appeal is concerned, we see no difference between the instant situation and that where one count of a multiple count indictment has been dismissed. Since an order of the latter type would be appealable under § 3731 by its very terms, we see no reason to treat the order in the instant case differently.

lated to the judge's sua sponte striking of portions of the indictment, reversal of the district court's order would result in reinstatement of the conviction. Alberti would not be subjected to another trial and consequently there would be no problem of double jeopardy. *Lee v. United States*, 432 U.S. 23, 30 (1977); *United States v. Wilson, supra*, 420 U.S. at 352–53. Similarly, even if we were to affirm the district court's order striking portions of the indictment, Alberti still would be obligated to stand trial a second time.

In those respects any double jeopardy claim in the instant case would be even more tenuous than it was in *United States v. Sanford*, 429 U.S. 14 (1976) (per curiam), *rev'g* 536 F.2d 871 (9 Cir. 1976). There the Court held that the double jeopardy clause did not bar retrial of defendants as to whom the judge had dismissed an indictment several months after a sua sponte declaration of a mistrial because of a hung jury. In *Sanford* the dismissal had been based on evidence adduced at trial relating to the general issue of guilt. *United States v. Sanford*, 503 F.2d 291, 293 (9 Cir. 1974), *vacated and remanded*, 421 U.S. 996 (1975), *on remand*, 536 F.2d at 872, 874 (9 Cir.), *rev'd*, 429 U.S. 14 (1976). But see *Martin Linen Supply, supra*, 430 U.S. at 575. The Court considered *Sanford* to be governed by *Serfass v. United States*, 420 U.S. 377 (1975), where the Court had held that a judge's pre-trial order dismissing an indictment against a defendant who had not waived his right to a jury trial could be appealed by the government under § 3731 since the defendant in such a case "has not been 'put to trial before the trier of facts, whether the trier be a jury or a judge.'" 420 U.S. at 394, quoting *United States v. Jorn*, 400 U.S. 470, 479 (1971). Although the Court agreed with the Ninth Circuit that jeopardy had attached in *Sanford* at the time of the empanelling of the jury for the first trial, thus distinguishing that case from *Serfass*, it considered *Serfass* controlling because "[t]he District Court's dismissal of the indictment occurred several months after the first trial had ended in a mistrial, but before the retrial of respondents had begun." 429 U.S. at 16. The dismissal therefore, "like that in *Serfass*, was prior to a trial that the government had a right to prosecute and that the defendant was required to defend." *Id.*

The key to *Sanford*, it seems to us, was the fact that the indictment had not been dismissed nor a judgment of acquittal entered before the new trial was ordered. See *Martin Linen Supply, supra*, 430 U.S. at 575–76, citing *United States v. Wilson, supra*, 420 U.S. at 348. When preparation for, or actions directed toward, the second trial already have taken place, it cannot accurately be said that it is the appellate court's reversal of the district court's dismissal that subjects the defendant to a new trial. This is what distinguishes *Sanford*, on the one hand, from *Martin Linen Supply* and our decision in *United States v. Suarez*, 505 F.2d 166 (2 Cir. 1974) (per curiam), on the other hand. See *Martin Linen Supply, supra*, 430 U.S. at 572 n. 11, 575.

The instant case is attracted by *Sanford* rather than by *Martin Linen*. Indeed our decision here follows a fortiori from the holding in *Sanford*. In *Sanford* the judge dismissed the indictment after the jury failed to reach agreement. Although the defendants had not been acquitted, neither had they been convicted. Here, on the contrary, the jury returned a verdict of guilty and the judge denied the motion for an acquittal. The decision to strike portions of the indictment was made with the new trial in mind and makes sense only in the context of the new trial. Although there was no time lapse here as there was in *Sanford* between the declaration of a mistrial and the dismissal of part of the indictment, the time lapse in *Sanford* was significant only because it emphasized the pretrial character of the dismissal order. The absence of such a time lapse is of no significance here. The order striking portions of the indictment was entered solely and expressly for purposes of the new trial and was accompanied

by denial of Alberti's motion for an acquittal.

To summarize our double jeopardy holding: this is a situation where, after the jury had returned a verdict of guilty and defendant's motion for an acquittal had been denied, defendant's motion for a new trial was granted on grounds unrelated to the motion for an acquittal; and for purposes of retrial the judge struck substantial portions of the indictment. Hence the striking, or dismissal, not only was "prior to a trial that the government had a right to prosecute and that the defendant was required to defend", but was prior to a new trial that defendant had requested in order to avoid imposition of sentence on a guilty verdict that the government already had obtained. Under these circumstances we hold that the double jeopardy clause does not bar retrial and that § 3731 authorizes the government's appeal.

3. Alberti's testimony before the grand jury as set forth in the indictment is as follows, with the stricken portions in italics:

"Q. Where do you see him?
A. At the club. There is a club on Ferry and Grant just like the Buffalo Athletic Club or the Catholic Club on Delaware Avenue, I forget what the name of it is, but like the Catholic Club on Delaware Avenue.
Q. Do you pay dues to belong to this club?
A. Every member pays a dollar or two dollars. You give a dollar or two dollars. You pay as you go along. When you win a pot, you give a dollar or two dollars, half a dollar, that is how they pay the rent.
Q. You say that a dollar or so comes out of the pot?
A. Whatever they want to give. They give a dollar, two dollars, half a dollar. They play short cards. They play rummy, gin rummy, tap rummy. They play poker.
Q. *Do they play some game called siginete?*
A. *Siginete?*
Q. *Yes, that is a high stakes card game.*
A. *Not necessarily, no.*
Q. *It isn't?*
A. *I haven't seen any game of siginete. Every time I go in there, the doors are open. You can go in there anytime. I go in there and have coffee, watch TV like a lot of other people do.*
Q. *Isn't it true, Mr. Alberti, that there is a high stake siginete game that is in operation at that club almost twenty-four hours a day?*

## III. STRIKING PORTIONS OF THE INDICTMENT

The single count indictment contained several specifications of perjury consisting of Alberti's answers to four groups of questions put to him before the grand jury.[3] The first group of questions probed Alberti's knowledge of ziganette card games played at Nairy's Social Club. The second group concerned the activities and participation in the game of one Michael Bona. The third and fourth groups involved Alberti's knowledge, respectively, about the dealers of the game and about the percentage of wagers taken by the house as profits from the game.

The district court held that the third and fourth groups of questions were sufficiently succinct and direct, and that Alberti's answers could support a conviction. Those portions of his testimony are still in the

A. *I have never seen one. I have never seen one, sir. I don't recall ever seeing one.*
          *  *  *  *  *  *
Q. *What does Mr. Bona do for a living?*
A. *I don't know.*
Q. *He is at the club every day; isn't he?*
A. *I don't know if he is at the club every day. I don't know any activities that the man is in.*
          *  *  *  *  *  *
Q. Does he have anything to do with the siginete game?
A. Not to my knowledge.
Q. Nothing to do whatsoever with the siginete game?
A. No, *not to* my knowledge.
Q. What is the percent that the house takes out of the siginete game?
A. I don't know.
Q. Is it 5%?
A. I don't know.
Q. You don't know if it is 5%?
A. No.
Q. You don't know of any fixed percent that is taken from the pot?
A. No, I don't know.
Q. You are sure of that?
A. Yes, I am positive.
Q. Have you ever been a dealer in that game?
A. No, never.
Q. Never?
A. No, never.
Q. Do you know who the dealers are?
A. No."

indictment and are not involved on this appeal.

But the court struck from the indictment the first group, and parts of the second group, of questions and answers. It held, first, that the questions about the ziganette game were too imprecise and ambiguous and, second, that the government had not introduced sufficient evidence of the falsity of Alberti's answers to some of the questions about Bona. We hold that both rulings were erroneous.

■ The first group of questions and answers was as follows:

"Q. Do they play some game called siginete?

A. Siginete?

Q. Yes, that is a high stakes card game.

[1] A. Not necessarily, no.

Q. It isn't?

[2] A. I haven't seen any game of siginete. Every time I go in there, the doors are open. You can go in there anytime. I go in there and have coffee, watch TV like a lot of other people do.

Q. Isn't it true, Mr. Alberti, that there is a high stake siginete game that is in operation at that club almost twenty-four hours a day?

[3] A. I have never seen one. I have never seen one, sir. I don't recall ever seeing one."

The court found that answer [1], although misleading, was not false, and that answer [2] was unresponsive. Answer [1] however suggests that defendant was familiar with ziganette. Answer [2] relates back and responds to the first question and sets the foundation for defendant's denial in answer [3] of having seen a ziganette game at Nairy's. The preceding questions and answers constituted the predicate for question [3]. They provided the context in which Alberti made the materially false statements in answer [3]. We have approved the practice of including in the indictment

"enough of the testimony surrounding the allegedly false statements to place them in coherent context." *United States v. Bonacorsa*, 528 F.2d 1218, 1221 (2 Cir.), *cert. denied*, 426 U.S. 935 (1976); see *Stassi v. United States*, 401 F.2d 259, 262 (5 Cir. 1968), *vacated on other grounds sub nom. Giordano v. United States*, 394 U.S. 310 (1969). At the new trial Alberti is entitled to limiting instructions to ensure that he is not convicted for his unresponsive but true statement that ziganette is "[n]ot necessarily" a high stakes card game. *Bronston v. United States*, 409 U.S. 352, 359 (1973).

■ The court also held that answer [3] could not support a conviction because it is "literally true". The court reasoned that "Alberti testified that he was not at Nairy's around the clock, the evidence did not show that the ziganette game was in operation continuously, and the evidence showed that not all the games were for high stakes." We believe that the court misconstrued the nature of the question and the significance of the answer. Alberti's continuous presence at Nairy's was not essential to the falsity of his answer, for the answer depended only on the state of his knowledge, not on the extent of his presence at Nairy's. Nor was the government required to prove that the game was played continuously. The meaning of the phrase "almost twenty-four hours a day", although a figure of speech, is clear. "[T]he . . . interpretation placed upon the question by the defendant at the time of the alleged prevarication . . . is an issue for the jury . . . ." *United States v. Corr*, 543 F.2d 1042, 1049 (2 Cir. 1976); see *Bonacorsa, supra*, 528 F.2d at 1221. Here there was much evidence from which the jury could infer that Alberti knew that ziganette was played at Nairy's on a regular basis, day and night. And the fact that ziganette is not *always* played for high stakes is not fatal, for Alberti stated that he had "never" seen a high stakes ziganette game played at Nairy's.

The grand jury was trying to ascertain whether Alberti had knowledge that a high

stakes ziganette game was played at Nairy's on a fairly regular and continuous basis.

> "When viewed with anything but the partisan eye of an advocate, the questions, as they followed one upon the other, were pointed toward the development of this information. Absent fundamental ambiguity or imprecision in the questioning, the meaning and truthfulness of appellant's answer was for the jury," *Bonacorsa, supra*, 528 F.2d at 1221.

■ The second group of questions and answers in the instant case concerned the connection of Bona with the ziganette game. The portion excised was as follows:

> "Q. What does Mr. Bona do for a living?
> A. I don't know.
> Q. He is at the club every day; isn't he?
> A. I don't know if he is at the club every day. I don't know any activities that the man is in."

The court held that there was insufficient evidence to support a perjury conviction based on these questions and answers because there was no evidence about Bona's occupation or that Alberti was at the club every day. Again, the truth or falsity of Alberti's answers was a question for the jury. There was evidence of Bona's activity at Nairy's in Alberti's presence from which a jury could infer that Bona ran the game for a living. Further, these questions and answers led to other questions and answers about Bona's participation in the ziganette game which the court held, and we agree, were sufficient to support a conviction. The second group of questions and answers as such was properly included in the indictment. *Bonacorsa, supra*, 528 F.2d at 1221.

■ We hold that none of Alberti's grand jury testimony should have been stricken from the indictment. We direct that at the second trial the jury should be instructed, in accordance with *Bronston, supra*, 409 U.S. at 359, that it may not convict

for unresponsive but literally true declarations.

Appeal dismissed as to that part of the order which granted a new trial; as to that part of the order which struck portions of the indictment, reversed and remanded with directions. The mandate shall issue forthwith.