**UNITED STATES of America,
Appellant,**

v.

**Douglas P. FIELDS, Frederick M. Friedman, Peter S. Davis, Alan E. Sandberg, and Eric Berge, Defendants-Appellees.**

No. 342, Docket 77–1342.

United States Court of Appeals,
Second Circuit.

Argued Nov. 16, 1977.

Submitted Jan. 11, 1978.

Decided Sept. 14, 1978.

Rehearing and Rehearing En Banc
Denied Feb. 14, 1979.

---

**640**

David A. Cutner, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty.,

and Lawrence B. Pedowitz, Asst. U. S. Atty., New York City, on the brief), for appellant United States.

Louis Bender and Sandor Frankel, New York City, for defendants-appellees Fields and Friedman.

Gary P. .Naftalis, New York City (Sheldon H. Elsen, Leslie A. Lupert, Gary H. Greenberg, and Orans, Elsen & Polstein, New York City, on the brief), for defendant-appellee Davis.

Norman S. Ostrow, New York City (Frank H. Wright, and Grand & Ostrow, New York City, on the brief), for defendant-appellee Sandberg.

Hochman, Salkin & DeRoy, and Stephen V. Wilson, Beverly Hills, Cal., filed a brief for defendant-appellee Berge.

Harvey L. Pitt, Gen. Counsel, Paul Gonson, Associate Gen. Counsel, Irving H. Picard, Asst. Gen. Counsel, and Lawrence A. Horn, Atty., SEC, Washington, D. C., filed a brief for Securities and Exchange Commission, amicus curiae.

Before FEINBERG, MANSFIELD and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

On this appeal by the United States[1] from an order entered in a *criminal* action prior to trial in the Southern District of New York, Charles S. Haight, Jr., *District Judge,* [1977–1978 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 96,074 (S.D.N.Y., June 2, 1977), which dismissed and struck substantial portions of a securities fraud indictment because of alleged misconduct by SEC employees in attempting to settle a *civil* action brought by the SEC against defendants who later were named as defendants in the criminal action, the chief question is whether the district court abused its discretion.[2] We hold that it did.

We affirm in part, and reverse and remand in part, with directions to reinstate

---

**1.** The appeal is authorized by 18 U.S.C. § 3731 (1976). See *United States v. Alberti,* 568 F.2d 617, 620–23 (2 Cir. 1977), cited with approval, *Sanabria v. United States,* 437 U.S. 54, 69 n. 23 (1978).

**2.** Other subordinate questions are presented, as will appear below in this opinion.

the unexpurgated indictment and to proceed with the case in the district court according to law.

## I.

The indictment which is the subject of the instant appeal was returned November 8, 1976. It named as defendants, all of whom are appellants herein, Douglas P. Fields, Frederick M. Friedman, Peter S. Davis, Alan E. Sandberg, and Eric Berge. The specific offenses charged against the respective defendants are summarized in the margin.[3]

To the extent necessary to an understanding of our rulings on the legal issues presented, we summarize here the essential facts and fraudulent transactions charged in the indictment.[4] They occurred during the two year period from March 1971 to March 1973. They involved two publicly held corporations, TDA Industries, Inc. (TDA) and its subsidiary, Westcalind Corp. (Westcalind). Defendants were officers and directors of the two corporations, except that Davis, an attorney, was general counsel to TDA.

### (A) Westcalind Kickback

In March 1971, while Fields and Friedman were officers and directors of TDA, they caused Westcalind to pay a $50,000 "finder's fee" to a third party for services never performed. The "finder" retained $15,000 and kicked back the $35,000 balance to Fields and Friedman.

### (B) ERD Kickbacks

In April and May 1971, Friedman and Davis refused requests by a group of TDA shareholders to "free-up" their lettered stock for public sale. These defendants falsely represented to the stockholders that the stock in question could be transferred only by a private placement. They then arranged for a private placement of the stock to themselves at a $2 per share discount from the market price. As soon as they acquired the stock, and by a prearrangement not disclosed to the selling stockholders, they did "free-up" the stock and sold it on the open market. Seventy percent of the gross profit was kicked back to these defendants, resulting in a profit to them in excess of $300,000. This transaction defrauded the selling TDA stockholders of $435,000.

### (C) Manipulation of Price of TDA Stock

In November 1971, Fields paid certain co-conspirators to buy TDA stock on the open market immediately prior to a public

| 3. | Count | Defendant | Violation | Statute |
|---|---|---|---|---|
| | One | Fields, Friedman, Davis | Conspiracy to violate securities laws | 18 U.S.C. § 371 |
| | Two | Fields, Friedman, Davis | Securities fraud | 15 U.S.C. § 77q(a) |
| | Three | Fields, Friedman, Davis | Filing false prospectus with the SEC | 18 U.S.C. § 1001 |
| | Four | Fields, Friedman, Davis | Soliciting proxies with false proxy statements | 15 U.S.C. § 78n(a) |
| | Five | Fields, Friedman, Berge, Davis | Soliciting proxies with false proxy statements | 15 U.S.C. § 78n(a) |
| | Six | Friedman, Sandberg | Wire Fraud | 18 U.S.C. § 1343 |
| | Seven-Ten | Friedman, Sandberg | Mail Fraud | 18 U.S.C. § 1341 |
| | Eleven | Friedman | Soliciting proxies with false proxy statements | 15 U.S.C. § 78n(a) |
| | Twelve | Berge | False testimony before the SEC | 18 U.S.C. § 1001 |

---

**4.** We emphasize that our summary is of facts and transactions *charged* in the indictment. Each defendant, having pleaded not guilty, is presumed innocent unless and until convicted.

secondary offering of the stock. This was intended artificially to inflate the offering price.

#### (D) *Eagle Roofing Kickback*

In February and March 1973, Friedman and Sandberg, each of whom was an officer and director of TDA, caused TDA to pay another sham "finder's fee", this time in amount of $100,000, to another third party for services never performed. The "finder" retained $18,000 and kicked back the $82,000 balance to Friedman and Sandberg.

#### (E) *Other Offenses Charged*

In addition to the four transactions referred to above, the indictment charges the following other offenses:

Fields, Friedman and Davis prepared and filed an offering prospectus for TDA stock which failed to disclose the Westcalind kickback, the ERD kickbacks and the TDA price manipulation. They also solicited proxies from TDA stockholders without disclosing these matters in the proxy statements.

Fields, Friedman, Davis and Berge (the latter an officer and director of Westcalind) solicited proxies from Westcalind shareholders without disclosure of the Westcalind kickback, the ERD kickbacks and the TDA price manipulation.

Friedman and Sandberg violated the wire fraud and mail fraud statutes in connection with the Eagle Roofing kickback.

Berge gave false testimony under oath before the SEC about the Westcalind kickback.

Reiterating what we have said above, note 4 *supra*, the foregoing summary is of offenses *charged* in the indictment, not a summary of crimes proven. Nevertheless, for the purpose of evaluating the action of

the district court in dismissing and striking substantial portions of the indictment and to understand our rulings on the legal issues presented, suffice it to say that the indictment charges each of the defendants with very serious offenses which, if proven, constituted a clear fraud on public investors.

### II.

We focus next on the sequence of events during 1974 and 1975—chiefly, certain negotiations between counsel for defendants and employees of the SEC's New York regional office—upon which the district court based its order dismissing and striking substantial portions of the indictment.[5]

Backing up for a moment, during 1974 and early 1975, the office of the District Attorney for New York County conducted an investigation of the Westcalind, ERD and Eagle Roofing kickbacks referred to above. The targets of this investigation were Fields, Friedman and Davis (represented by attorneys Milton S. Gould, Esq. and Saul S. Streit, Esq.) and TDA (represented by attorney Herbert C. Kantor, Esq.).

On January 9, 1975, Gould and Streit were informed by Assistant District Attorney Driscoll that his office had concluded that the three kickback transactions were not offenses cognizable under New York law. On the following day, January 10, anticipating that the District Attorney's office would refer the matter to the SEC's New York regional office, Gould telephoned William Moran, Esq., the SEC's New York regional administrator, and made an appointment to see him on January 14. Before telephoning Moran, Gould had advised Fields, Friedman and Davis that it would be preferable to take the initiative and bring

---

5. In ruling as we do on the chief legal question presented—that the district court abused its discretion in dismissing and striking substantial portions of the indictment—we accept the district court's findings of fact on that issue. In short, we assume, without deciding, the correctness of the district court's findings.

While we disagree with the conclusions reached by Judge Haight, we have found his

comprehensive eighty-two page opinion to be helpful in setting forth the evidence adduced during the eleven day hearing before him. And we have found especially commendable his candor in evaluating the testimony and acknowledging that his findings hinged on close questions of credibility.

the matter to the attention of the SEC before the District Attorney's office did. His clients agreed and authorized Gould to make the necessary disclosures to the SEC. Kantor received similar authority from the TDA board.

On January 14, Gould (representing Fields, Friedman and Davis) and Kantor (representing TDA) met in the SEC's New York regional office with Moran and members of his staff, including Jeffrey Tucker, Esq., a branch chief, and Stuart Perlmutter, Esq., a staff attorney. At this meeting Gould and Kantor disclosed to the SEC employees the three kickback transactions which had been under investigation by the District Attorney's office. They did not disclose to the SEC then, or at any other time, the scheme to manipulate the price of TDA stock referred to above. The upshot of the January 14 meeting was that Gould proposed negotiations looking toward a possible civil settlement of the transactions disclosed, on the assumption that the SEC's investigation would not turn up something new. Moran said that he first would have to obtain authorization from the SEC's Division of Enforcement for a formal investigation of the alleged *civil* violations. Such authorization was granted on February 19.

The chief purpose of the disclosures which defendants' counsel made at the January 14 meeting was to avoid a criminal reference to the Department of Justice.[6] Defendants' counsel, being thoroughly experienced in SEC procedure and in criminal matters, recognized from the outset that defendants' activities constituted criminal offenses under the federal securities laws. Their best hope, so they urged, was to work out some sort of a package by which defendants would accept the imposition of civil sanctions in return for the avoidance of a criminal reference. Defendants' experienced counsel of course also were aware of the SEC's long standing and well known

policy *against* settling civil actions in a manner that would impair subsequent criminal prosecutions.

As the result of the SEC's investigation which had been authorized on February 19 and after a number of conversations between defendants' counsel and the SEC employees regarding a possible civil settlement, the SEC commenced a civil action on September 16, 1975 in the Southern District of New York, entitled *SEC v. TDA Industries, Inc., et al.*, 75 Civ. 4519–LWP. The complaint named as defendants TDA, Westcalind and the five individual defendants later charged in the instant indictment. The complaint was based on the three kickback transactions which Gould and Kantor disclosed to the SEC at the January 14 meeting. The complaint sought injunctive and other relief, including an order that defendants disgorge the fraudulently obtained "finder's fees" and the appointment of receivers for the two corporate defendants.

During settlement negotiations between defendants' counsel and the SEC employees, both before and after the commencement of the SEC civil action on September 16,[7] defendants' counsel repeatedly stated their desire to avoid a criminal reference if a consent judgment could be worked out in the civil proceedings.

Throughout these negotiations Tucker and Perlmutter of the SEC were aware of the stated objective of defense counsel to avoid a criminal reference if a consent judgment could be agreed upon. Tucker and Perlmutter remained silent during this period in response to the statements of defense counsel as to their objective. Such silence was interpreted by defense counsel as assent by Tucker and Perlmutter to defense counsel's proposal to avoid a criminal reference. Nevertheless, as we state below, Tucker and Perlmutter were in touch with the United States Attorney's office as early

---

6. See discussion at pp. 644–646, *infra* regarding the SEC's criminal reference procedure, both formal and informal references.

7. Such negotiations took place on February 28, June 17, September 4, September 30 and Octo-

ber 20. At the latter two meetings, defendants' counsel stated their understanding that an agreement had been reached that no criminal reference would be made.

as September 16 on the subject of a prospective criminal reference of the TDA matter.

As for the negotiations to settle the civil action, on December 1 a settlement offer was made by Gould and Streit to Tucker and Perlmutter, both of whom viewed the offer favorably. They recommended to their superiors that it be accepted. It was. Consents to the entry of judgment in the civil action were signed by Fields, Friedman and Davis on December 10 and 11, and judgments in the action as to them were entered on February 5, 1976. Similar consents were signed by Sandberg and Berge on January 6 and February 10, and judgments as to them were entered on January 16 and February 23. None of the defendants or their counsel knew, when the consents to the entry of judgment in the civil action were signed, that Tucker had communicated with the United States Attorney's office concerning the TDA matter on December 1, as stated below.

As indicated above, Tucker and Perlmutter, beginning in September 1975, had been in touch with the United States Attorney's office about a criminal reference of the TDA matter. These contacts with Assistant United States Attorney Sorkin[8] continued during October and November. During this period Tucker and Perlmutter urged the United States Attorney's office to investigate the TDA matter but they made it clear that they wanted to conclude a settlement in the civil action before making a criminal reference.

On December 1, shortly after Gould and Streit had made the offer to settle the civil action, Tucker, in the presence of the Assistant Regional Administrator of the SEC's New York Regional Office, communicated regarding the TDA matter with Assistant United States Attorney Wing, Chief of the Fraud Unit of the United States Attorney's office. This was done by telephone, followed by a letter dated December 1 from Tucker to Wing enclosing the SEC's pleadings file in the TDA case.

There followed an investigation of the TDA matter by the United States Attorney's office, presentation of the case to a grand jury, and the return of the instant indictment on November 8, 1976.

### III.

Before getting to the chief issue on this appeal as stated above, we shall take up as a preliminary matter the claim asserted by some of the appellees, namely, that the communications regarding this case by the Commission's staff to the United States Attorney's office on December 1, 1975 were contrary to the applicable statutes, rules and regulations. This ground for dismissal of the indictment[9] was urged upon the district court, as it is upon us. The district court rejected it. We also reject it.

The claim in essence is that the statutes authorize only the "Commission" to transmit evidence to the Attorney General for criminal proceedings, and that therefore the informal criminal reference on December 1, 1975 by the SEC's New York regional office to the United States Attorney's office "constituted an invalid criminal reference requiring dismissal of the resulting indictment."[10] We hold that this claim is totally without merit.

It is important to bear in mind the distinctions, under SEC procedure, between preliminary communications between the Commission's staff and the United States Attorney's office, which may occur in the context of either a formal or informal in-

---

8. Not to be confused with Stanley Sporkin, Esq., Director of the SEC's Division of Enforcement, who testified before Judge Haight on this matter.

9. This alternative ground for dismissal of the indictment, urged by some but not all of the appellees, should not be confused with the alternative grounds for dismissal of portions of the indictment which we discuss below under section V of this opinion. The district court sustained appellees' alternative grounds for dismissal referred to in section V; it rejected the alternative ground discussed here.

10. Brief of Appellee Sandberg, filed January 6, 1978, at 7. Substantially the same claim is adopted by some of the other appellees.

vestigation, and Commission criminal references, which may in turn be either formal or informal.[11]

■ With respect to the investigation procedure, the *informal, or preliminary, investigation* does not require members of the staff to obtain Commission authorization before turning over public or nonpublic investigative materials to the United States Attorney's office. On the other hand, a *formal investigation* of alleged criminal violations, where issuance of process or compulsion of testimony is necessary, does require Commission authorization. A formal investigation may or may not be preceded by an informal or preliminary one. 17 C.F.R. § 202.5(a) (1977).[12]

As for the criminal reference procedure, whether formal or informal, it is authorized by statute and by Commission rules and regulations. In view of the fraudulent transactions charged in the instant indictment, we look to the Securities Act of 1933 [13] and the Securities Exchange Act of 1934,[14] each of which provides the statutory authorization for the Commission to transmit to the Attorney General available evidence of violations of the statutes involved for possible criminal proceedings.[15] Moreover, the Commission is authorized by statute to delegate "any of its functions" to an employee, among others.[16] In its Manual of Administrative Regulations, the Commission has delegated its authority to act to

11. These important distinctions are clearly and concisely set forth in the SEC's amicus curiae memorandum which was filed in this case at our request after oral argument. We requested the amicus memorandum because of the confusion on this matter which was evident in the briefs and oral argument of appellees' counsel.

The SEC procedure, with respect to both *investigations* and *criminal references*, also was explained in detail by Stanley Sporkin, Esq., Director of the SEC's Division of Enforcement, at the hearings before Judge Haight who referred to Mr. Sporkin's testimony in ruling as he did on this issue.

12. 17 C.F.R. § 202.5(a) (1977) in relevant part provides:

"Where, from complaints received from members of the public, communications from Federal or State agencies, examination of filings made with the Commission, or otherwise, it appears that there may be violation of the acts administered by the Commission or the rules or regulations thereunder, a preliminary investigation is generally made. In such preliminary investigation no process is issued or testimony compelled. When it appears from information obtained either with or without a preliminary investigation that there is a likelihood that a violation has been or is about to be committed and that the issuance of process may be necessary, the matter is reported to the Commission, which may then order a formal investigation or examination, if it is deemed necessary . . . ."

13. Section 20(b) of the 1933 Act, 15 U.S.C. § 77t(b) (1976), in relevant part provides:

"The Commission may transmit such evidence as may be available concerning such acts or practices to the Attorney General who may, in his discretion, institute the necessary criminal proceedings under this subchapter . . . ."

14. Section 21(d) of the 1934 Act, 15 U.S.C. § 78u(d) (1976), in relevant part provides:

"The Commission may transmit such evidence as may be available concerning such acts or practices as may constitute a violation of any provision of this chapter or the rules or regulations thereunder to the Attorney General, who may, in his discretion, institute the necessary criminal proceedings under this chapter."

15. The other statutes administered by the Commission contain similar provisions authorizing the Commission to make criminal references to the Attorney General. *See, e. g.*, Section 18(f) of the Public Utility Holding Company Act, 15 U.S.C. § 79r(f) (1976); Section 321(a) of the Trust Indenture Act, 15 U.S.C. § 77uuu(a) (1976); Section 42(e) of the Investment Company Act, 15 U.S.C. § 80a–41(e) (1976); and Section 209(e) of the Investment Advisers Act, 15 U.S.C. § 80b–9(e) (1976).

16. 15 U.S.C. § 78d–1(a) (1976) in relevant part provides:

"In addition to its existing authority, the Securities and Exchange Commission, hereinafter referred to as the 'Commission', shall have the authority to delegate, by published order or rule, any of its functions to a division of the Commission, an individual Commissioner, a hearing examiner, or an employee or employee board, including functions with respect to hearing, determining, ordering, certifying, reporting, or otherwise acting as to any work, business, or matter: . . . ."

This statute, although codified as indicated, is not part of the Securities Exchange Act of 1934. It was enacted as Section 1 of the Act of Aug. 20, 1962, Pub.L. 87–592, 76 Stat. 394.

Directors of Divisions and Regional Administrators, and further has empowered these officials to redelegate such authority to designated members of their respective staffs.[17] The Commission's Manual specifically authorizes and *encourages* the disclosure of non public information to other federal law enforcement officials even when it has been developed in other than a formal investigation.[18]

The district court below found that during recent years it has been the SEC policy in the Southern District of New York for the Regional Administrator to redelegate his authority to lower echelon attorneys for the purpose of conferring with the United States Attorney's office at an early stage of either a formal or informal investigation. We hold that the district court correctly declined to dismiss the indictment on this ground.

As the SEC points out in its amicus brief, the procedure permitting preliminary communications with the United States Attorney has significant advantages. Allowing early participation in the case by the United States Attorney minimizes statute of limitations problems. The more time a United States Attorney has, the easier it is for him to become familiar with the complex facts of a securities fraud case, to prepare the case, and to present it to a grand jury before expiration of the applicable statute of limitations. Earlier initiation of criminal proceedings moreover is consistent with a defendant's right to a speedy trial. We decline, as the district court likewise declined, to interfere with this commendable example of inter-agency cooperation.[19]

## IV.

This brings us to what we regard as the chief issue in the case—whether the district court in this *criminal* action abused its discretion in dismissing and striking substantial portions of the indictment [20] because of

---

**17.** Section 171.02A of the Commission's Manual of Administrative Regulations provides:

"Section 171: Cooperation With Federal, State and Foreign Government Authorities and With Self-Regulatory Organizations

171.02 *Responsibility and Redelegation.*
A. Authority to act in matters covered in this Section is hereby delegated by the Commission to Directors of Divisions and Regional Administrators having cognizance over cases in which cooperation with other Federal, State or foreign authorities or self-regulatory organizations is in the public interest. These Commission officials may redelegate authority to act to designated members of their staffs."

**18.** Sections 171.06 and 171.07 of the Commission's Manual provide:

"171.06 *Cooperation With Other Federal Law Enforcement Authorities.* Since Commission cases frequently involve violations of the mail fraud statute and may involve other Federal statutes, *the Commission recommends and encourages full cooperation with* inspectors of the United States Post Office Department and other *Federal law enforcement officials. Commission officials are authorized in their discretion to make information developed in the course of their investigations,* other than formal investigations which have been ordered by the Commission, and other non-public information *available to these officials and to render such investigative assistance as may be required.*" (emphasis added).

"171.07 *Furnishing Information to Other State and Federal Law Enforcement Agencies.* In cases not falling within Subsections .05 and .06 of this Section, that is, situations other than referral of a matter for State enforcement action, or cooperation with the Post Office Department or other Federal law enforcement officials, *Commission officials are authorized in their discretion to make available to Federal* and State *law enforcement agencies information developed in the course of an investigation* other than a formal investigation which has been ordered by the Commission and other non-public information when the Commission official is satisfied that such action clearly will not interfere with the Commission's enforcement functions in the particular case or in other cases." (emphasis added).

**19.** Congress only recently has expressed its expectation that this cooperation will continue:

"Traditionally, there has been a close working relationship between the Justice Department and the SEC. The Committee [on Interstate and Foreign Commerce] fully expects that this cooperation between the two agencies will continue. . . ." H.R. Rep.No. 95–650, 95th Cong., 1st Sess. 10 (Sept. 28, 1977).

**20.** Of the twelve count indictment returned by the grand jury on November 8, 1976, the district court's order of June 3, 1977 dismissed eight substantive counts in their entirety, i. e. Counts Four, Five, Six, Seven, Eight, Nine, Ten

alleged misconduct by employees of the SEC in attempting to settle the *civil* action. On this issue we hold that the district court did abuse its discretion. We reverse and remand with directions to reinstate the unexpurgated indictment.

The district court recognized that, aside from *the most drastic remedy* of dismissing the indictment (as urged by all defendants), there were available at least two alternative remedies, i. e. "admonishment to the SEC" and "[p]ermitting the defendants to reopen the consent judgments entered in the civil suit".[21]

We believe on the facts of this case that the district court, in opting for the most drastic remedy available to it, abused its discretion. The relief granted was wholly out of proportion to the wrong sought to be corrected. And it was contrary to the law of this circuit or any other circuit, so far as we are aware.

The extreme sanction of dismissal of an indictment is justified in order to achieve one or both of two objectives: first, to eliminate prejudice to a defendant in a criminal prosecution;[22] second, to "help to translate the assurances of the United States Attorneys into consistent performances by their assistants."[23] Here, dismissal of the indictment served neither objective.

We agree with the district court that the conduct of the SEC employees in concealing their reference of this case to the United States Attorney and in leading defense counsel to believe the opposite was improper. But we fail to see any resulting harm to defendants. By that time defendants, with their backs to the wall because of the New York County District Attorney's anticipated reference of the matter to the SEC, had long since disclosed enough facts to the SEC to enable the government to marshal the evidence and to proceed both civilly and criminally against them. Thus, even assuming arguendo that the SEC was en-

and Eleven. It also struck from the conspiracy count (Count One) paragraphs 10(d), 10(e), 10(f)(i), 10(f)(ii), 10(f)(iii), 10(f)(iv), 10(f)(v), 10(f)(vi), 10(g)(i), 10(g)(ii), 10(g)(iii), 10(g)(iv), 10(g)(v), 10(h) and 11(e).

This resulted in the dismissal of the indictment in its entirety against three of the five defendants, i. e., Friedman, Davis and Sandberg.

The district court's order left remaining for trial only defendant Fields on paragraphs 10(a), 10(b) and 10(c) of the conspiracy count (Count One), limited to Fields' manipulation of the price of TDA stock; and defendant Berge on Count Twelve for giving false testimony before the SEC. Berge's case was severed for medical reasons.

The theory on which the district court dismissed and struck most of the indictment was that the portions which it dismissed or struck related to "transactions and matters specifically referred to in [the civil consent judgment]." We have some difficulty following the district court's line of demarcation, in dismissing and striking portions of the indictment, even on the district court's own theory. But our difficulty in this respect is of no consequence. We direct that the entire unexpurgated indictment be reinstated.

**21.** Arguments have been addressed to us with respect to these so-called "alternative" remedies, particularly whether the judgment below should be modified accordingly.

We decline the invitation to rule upon anything except what is before us, namely, the order of the district court dismissing and striking substantial portions of the indictment, as to which we reverse.

As for the civil action which was assigned to Judge Pierce—not to Judge Haight—nothing in this opinion is to be construed as expressing or implying any views on our part. That case is not before us.

**22.** *United States v. Jacobs,* 531 F.2d 87, 90 (2 Cir.) (dismissal of perjury count of indictment affirmed in interest of *prosecutorial* fairness in the same district regarding warning grand jury witness that she was a target of investigation), *vacated and remanded,* 429 U.S. 909, *aff'd on remand,* 547 F.2d 772 (2 Cir. 1976), *cert. dismissed,* 436 U.S. 31 (1978); *United States v. Minnesota Mining & Mfg. Co.,* 551 F.2d 1106, 1112 (8 Cir. 1977) (dismissal of indictment affirmed because of breach of "*prosecutorial* agreement, the inviolability of which rested completely in the province of the government *prosecutors*" (emphasis added)); *United States v. Henderson,* 525 F.2d 247, 250 & n. 12 (5 Cir. 1975) (dismissal of indictment affirmed because of failure of *prosecutor* to furnish defendants with transcript of prior state court trial where three of defendants had been acquitted).

**23.** *United States v. Estepa,* 471 F.2d 1132, 1137 (2 Cir. 1972) (Friendly, J.); *accord, United States v. Jacobs, supra,* 547 F.2d at 778 (on remand).

gaged in enforcement of federal *criminal* laws when it negotiated the *civil* consent decree—a proposition about which we have considerable doubt—it clearly was an abuse of discretion for the district court to employ such a severe sanction against the government on the facts of this case.

■ Even when a *prosecutorial* arm of the government unlawfully obtains evidence, we normally limit the permissible sanction to suppression of the illegally obtained evidence. It is only in the rare case, where it is impossible to restore a criminal defendant to the position that he would have occupied vis-a-vis the prosecutor, that the indictment may be dismissed. *E. g., United States v. Jacobs, supra; United States v. Estepa, supra.*

The improper conduct here certainly was not as egregious as that in *United States v. Rodman,* 519 F.2d 1058 (1 Cir. 1975), where the SEC not only broke its promise but obtained incriminating evidence from the defendant in reliance on that promise. Moreover, the promise there was to "strongly recommend" against prosecution.

■ As for the deterrence objective of the district court's order here, proper regard for the public interest in the prosecution of crimes counsels restraint in dismissing an indictment for deterrence purposes unless the course of official misconduct is a demonstrated, long-standing one. We have approved this extreme sanction only when the pattern of misconduct is widespread or continuous. *United States v. Jacobs, supra; United States v. Estepa, supra.*

What we have here is an isolated instance of misconduct by two employees of a large government agency. There is no contention that SEC employees generally fail to disclose to defense counsel the release of relevant information or a criminal reference to the Department of Justice. We know of no other instance where this has occurred.

Since the district court's extreme sanction of dismissal of the indictment is not justified on grounds of eliminating preju-

dice to the defendants in this criminal prosecution or of deterring widespread or continuous official misconduct, we reverse the order and remand with directions to reinstate the unexpurgated indictment.

## V.

Finally, we turn to the district court's alternative grounds [24] for dismissing Counts One, Two, Three and Four. After holding that substantial portions of the indictment must be dismissed or stricken [25] because of the alleged misconduct by SEC employees in attempting to settle the civil action brought by the SEC against those who are defendants in the criminal action, the district court stated that "Quite apart from this basis for decision, there are alternative and compelling legal reasons why certain aspects of the indictment must be dismissed. . . . In order that the case be fully stated for the possible consideration of higher authority, I shall state the reasoning which underlies these alternative conclusions."

The district court then stated its alternative grounds (A) for dismissing Counts One, Two and Three, namely, that, for lack of materiality, the nondisclosure of the ERD kickbacks did not constitute violations of Section 17(a) of the 1933 Act or of the false statements statute, 18 U.S.C. § 1001 (1976); and (B) for dismissing Count Four, namely, that disclosure of the Westcalind and ERD kickbacks in TDA's proxy statements in December 1971 was not required by Section 14(a) of the 1934 Act and the proxy rules promulgated thereunder.

We disagree with the district court's alternative grounds for dismissal of Counts One, Two, Three and Four. We reverse its rulings on this aspect of the case.

(A) *Materality of Nondisclosure of ERD Kickbacks Under Counts One, Two and Three.*

■ The district court dismissed Counts One, Two and Three which relate to the

---

**24.** See note 9, *supra.*

**25.** See note 20, *supra.*

ERD kickbacks described in paragraphs 10(f) through 10(h) of Count One. The offense charged in Counts One and Two in substance is that one of the means employed by defendants in their fraudulent scheme was to issue a prospectus for a public offering of TDA common stock in November 1971 which was false and misleading in that it failed to disclose *material facts*—in violation of Section 17(a) of the 1933 Act.[26] Count Three charges defendants with having filed with the SEC a prospectus which concealed *material facts*—in violation of 18 U.S.C. § 1001 (1976).[27]

The theory upon which the district court dismissed these counts, as urged by defendants' counsel, was that as a matter of law the failure to disclose the ERD kickback transactions in the prospectus did not constitute violations of the statutes because the failure to disclose such transactions was not *material* to an informed decision by a prospective purchaser of TDA stock on the merits of investing in the company.

The error in the district court's ruling in this respect is best pointed up by the Supreme Court's definition of "materiality" and the Court's admonition against deciding that issue as a matter of law in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438 (1976):

> "An omitted fact is material if there is a substantial likelihood that a reasonable [investor] would consider it important in deciding [whether to purchase or sell securities]. . . .
>
> Put another way, there must be a substantial likelihood that the disclosure of

the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 449.

And, of critical importance here, the Court admonished:

> "The issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts. In considering whether summary judgment on the issue is appropriate, we must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact. *Only if the established omissions are 'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality' is the ultimate issue of materiality appropriately resolved 'as a matter of law' by summary judgment."* *Id.* at 450. (emphasis added) (citations omitted).

In the instant case, we hold that the government has shown a sufficient basis of materiality as defined by the Supreme Court in *TSC Industries, Inc. v. Northway, Inc., supra,* to charge nondisclosure of the ERD kickbacks as a violation of the statutes here involved. Defendants' $300,000

---

**26.** Section 17(a) of the 1933 Act, 15 U.S.C. § 77q(a) (1976), provides:

"(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

**27.** 18 U.S.C. § 1001 (1976) provides:

"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be [punished]."

profit on this transaction, while ultimately coming out of the pockets of the defrauded stockholders, may well be immediately recoverable by TDA, Inc. as a short swing purchase and sale under Section 16(b) of the 1934 Act, 15 U.S.C. § 78p(b) (1976).

**(B)** *Disclosure of Westcalind and ERD Kickbacks Under Count Four.*

■ As its alternative ground for dismissal of Count Four, the district court held that defendants were not required, under Section 14(a) of the 1934 Act [28] and Rule 14a–9 [29] promulgated thereunder, to disclose the Westcalind and ERD kickbacks in proxy statements distributed in December 1971. We disagree.

Item 7(f) of Schedule 14A, 17 C.F.R. § 240.14a–101(f) (1977), requires disclosure of:

"any transactions since the beginning of the issuer's last fiscal year . . . to which the issuer *or any of its subsidiaries* was or is to be a party, in which any of the following persons had or is to have a direct or indirect material interest . . . (1) Any director or officer of the issuer; (2) Any nominee for election as a director. . . ." (emphasis added).

If proven, defendants' failure to disclose their interest in the Westcalind kickbacks certainly would be a violation of Item 7(f) and consequently of Section 14(a).

Item 7(e)(4) of Schedule 14A, 17 C.F.R. § 240.14a–101 (1977), requires disclosure of:

"indebted[ness] to the issuer . . . [of e]ach director or officer of the issuer . . . [including] any indebtedness . . . [which] arose under Section 16(b) of the [Securities Exchange] Act. . . ."

Defendants' sale of TDA shareholders' lettered stock immediately after acquiring it in a private placement—the ERD kickbacks—clearly would violate Section 16(b). Accordingly, their failure to disclose these kickbacks, if proven, would constitute a violation of Item 7(e)(4) and consequently of Section 14(a).

To summarize:

(1) We affirm the district court's holding that the informal criminal reference of this case by the SEC to the United States Attorney was not contrary to the applicable statutes, rules and regulations.

(2) We reverse the district court's dismissal and striking of substantial portions of the indictment because of alleged misconduct by SEC employees in attempting to settle a civil action.

(3) We reverse the district court's dismissal of Counts One, Two, Three and Four on alternative grounds.

(4) We remand the case with directions to reinstate the unexpurgated indictment and to proceed with the case in the district court according to law.

28. Section 14(a) of the 1934 Act, 15 U.S.C. § 78n(a) (1976), provides:
"It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title."

29. Rule 14a–9 promulgated under the Exchange Act, 17 C.F.R. § 240.14a–9 (1977), in relevant part provides:

"(a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

Affirmed in part; reversed and remanded in part.

MANSFIELD, Circuit Judge (concurring):

I concur in Judge Timbers' carefully considered opinion.

I would only add that in my view the conduct of the SEC representatives (Tucker and Perlmutter) in continuing to negotiate a civil settlement after appellants' counsel had repeatedly stated that they were negotiating on the basis that there would not be any criminal reference was deceitful and duplicitous.

Judge Haight found that at the very first meeting between defense counsel and Messrs. Tucker and Perlmutter, which took place on January 14, 1975, Tucker was advised that defense counsel's objective was "the avoidance of a criminal reference" and this was made clear to the same SEC counsel at a meeting on February 28, 1975. Moreover, after rejecting Tucker's testimony to the effect that he had in September 1975 told defense counsel that there was "no deal on criminal" Judge Haight further found that on September 30, 1975, former Judge Streit, who was substituting for Mr. Gould as chief defense counsel, advised that "in light of the fact that there [was] to be no criminal prosecution," he would endeavor to obtain the amount of the repayment demanded by the SEC, to which Tucker and Perlmutter made no response even though Perlmutter had in the interim been in communication with the U.S. Attorney about the case. In October 1975 Perlmutter confirmed to a lawyer representing a prospective outside director of TDA that there would be no criminal reference, and an attorney for appellant Sandberg told Tucker and Perlmutter that he would advise his client to settle, since settlement was "better than going over to the golden dome [U.S. Courthouse]," to which the SEC counsel made no response.

Once they were advised by appellants' counsel of the basis on which the latter were proceeding, SEC counsel surely owed an ethical obligation immediately to correct the record by advising counsel that they had already initiated an informal criminal reference or at least that they felt free to do so. However, since appellants' counsel, with no viable alternative, faced the prospect that the incriminating evidence would in any event be forwarded by the New York County District Attorney to the SEC without restrictions on its use no prejudice warranting dismissal of the indictment is shown.