**SECURITIES AND EXCHANGE COMMISSION,**

v.

**DRESSER INDUSTRIES, INC.,**
**Appellant,**

**United States, Intervenor.**

**SECURITIES AND EXCHANGE COMMISSION,**

v.

**DRESSER INDUSTRIES, INC., Edward R. Luter, Appellant,**

**United States, Intervenor.**

**Nos. 78–1702, 78–1705.**

United States Court of Appeals, District of Columbia Circuit.

Argued en banc April 15, 1980.

Decided July 16, 1980.

Certiorari Denied Nov. 17, 1980.

---

David R. MacDonald, Chicago, Ill., with whom Francis D. Morrissey, Chicago, Ill., and Edward E. Dyson, Washington, D. C., were on brief, for appellant Dresser Industries, Inc.

Raymond G. Larroca, Herbert J. Miller, Jr., and Thomas B. Carr, Washington, D. C., were on supplemental memorandum for appellant Edward R. Luter.

Paul Gonson, Principal Associate Gen. Counsel, Securities and Exchange Commission, Washington, D. C., with whom Ralph C. Ferrara, Gen. Counsel, Michael K. Wolensky, Associate Gen. Counsel, and James H. Schropp and John P. Sweeney, Asst. Gen. Counsel, Securities and Exchange Commission, Washington, D. C., were on brief, for appellee.

Irvin B. Nathan, Deputy Asst. Atty. Gen., Washington, D. C., with whom Phillip B. Heymann, Asst. Atty. Gen., Washington, D. C., and Stephen G. Milliken, Atty., Dept. of Justice, Providence, R. I., were on brief, for intervenor.

Before WRIGHT, Chief Judge, and McGOWAN, TAMM, ROBINSON, MacKINNON, ROBB, WILKEY, WALD, MIKVA, and EDWARDS, Circuit Judges.

Opinion for the court filed by Chief Judge WRIGHT.

J. SKELLY WRIGHT, Chief Judge:

Dresser Industries, Inc. (Dresser) appeals from a decision of the District Court[1] requiring obedience to a subpoena *duces tecum* issued by the Securities and Exchange Commission (SEC) on April 21, 1978, and denying Dresser's motion to quash the subpoena.[2] The subpoena was issued in connection with an SEC investigation into Dresser's use of corporate funds to make what are euphemistically called "questionable foreign payments," and into the adequacy of Dresser's disclosures of such payments under the securities laws.

The principal issue facing this *en banc* court is whether Dresser is entitled to special protection against this SEC subpoena because of a parallel investigation into the same questionable foreign payments now being conducted by a federal grand jury under the guidance of the United States Department of Justice (Justice). Dresser argues principally that the SEC subpoena abuses the civil discovery process of the SEC for the purpose of criminal discovery and infringes the role of the grand jury in independently investigating allegations of criminal wrongdoing. On November 19, 1979 a panel of this court issued a decision affirming the District Court but, with Judge Robb dissenting, attaching a condition prohibiting the SEC from providing

---

1. *Reported at* 453 F.Supp. 573 (D.D.C.1978).

2. In No. 78–1705 Mr. Edward R. Luter, a senior vice president of Dresser, appeals from an order denying his motion to intervene in the subpoena enforcement proceeding. *See* text *infra*, 628 F.2d at 1384.

Justice with the information received from Dresser under this subpoena. Because of the importance of this issue to enforcement of the regulatory laws of the United States, this court voted to vacate the panel opinions and rehear the case *en banc*.

## I. BACKGROUND

### A. *Origin of the Investigations*

Illegal and questionable corporate payments surfaced as a major public problem in late 1973, when several major scandals implicated prominent American corporations in improper use of corporate funds to influence government officials in the United States and foreign countries. The exposure of these activities disrupted public faith in the integrity of our political system and eroded international trust in the legitimacy of American corporate operations abroad.[3] SEC investigation revealed that many corporate officials were falsifying financial records to shield questionable foreign and domestic payments from exposure to the public and even, in many cases, to corporate directors and accountants. Since the completeness and accuracy of corporate financial reporting is the cornerstone of federal regulation of the securities markets, such falsification became a matter of grave concern to the SEC.[4]

Beginning in the spring of 1974 the SEC brought a series of injunctive actions against certain American corporations. It obtained consent decrees prohibiting future violations of the securities laws and establishing internal corporate procedures for investigation, disclosure, and prevention of illegal corporate payments. However, the problem of questionable foreign payments proved so widespread that the SEC devised a "Voluntary Disclosure Program" to encourage corporations to conduct investigations of their past conduct and make appropriate disclosures without direct SEC coercion.[5] Participation in the Voluntary Disclosure Program would not insulate a corporation from an SEC enforcement action, but the Commission would be less likely to exercise its discretion to initiate enforcement actions against participants.[6] The most important elements of the Voluntary Disclosure Program were (1) an independent committee of the corporation would conduct a thorough investigation into questionable foreign and domestic payments made by the corporation; (2) the committee would disclose the results of this investigation to the board of directors in full; (3) the corporation would disclose the substance of the report to the public and the SEC on Form 8–K; and (4) the corporation would issue a policy statement prohibiting future questionable and illegal payments and maintenance of false or incomplete records in connection with them.[7] Except in "egregious cases" the SEC would not require that public disclosures include specific names, dates, and places. Rather, the disclosures might be "generic" in form.[8] Thus companies participating in the Voluntary Disclosure Program would ordinarily be spared the conse-

---

3. The Senate Committee on Banking, Housing, and Urban Affairs reported in May 1977:

 Recent investigations by the SEC have revealed corrupt foreign payments by over 300 U.S. companies involving hundreds of millions of dollars. These revelations have had severe adverse effects. Foreign governments friendly to the United States in Japan, Italy, and the Netherlands have come under intense pressure from their own people. The image of American democracy abroad has been tarnished. Confidence in the financial integrity of our corporations has been impaired. The efficient functioning of our capital markets has been hampered.

 S.Rep.No. 114, 95th Cong., 1st Sess. 3 (1977).

4. The history of the SEC's involvement with questionable and illegal foreign payments is recounted briefly in *Report of the Securities and Exchange Commission on Questionable and Illegal Corporate Payments and Practices*, submitted to the Senate Committee on Banking, Housing, and Urban Affairs, 94th Cong., 2d Sess. (Comm.Print 1976), *reprinted in* CCH Federal Securities Law Reports, No. 642 (May 19, 1976) (hereinafter cited as Report).

5. The Voluntary Disclosure Program is described in *id.* at 8–13.

6. *Id.* at 8 n.7.

7. *See id.* at 8-10.

8. *Id.* at 32.

quences to their employees, property, and business that might result from public disclosure of specific instances of foreign bribery or kickbacks. However, companies participating in the Voluntary Disclosure Program had to agree to grant SEC requests for access to the final report and to the unexpurgated underlying documentations.[9]

### B. The Dresser Investigations

On January 27, 1976 an attorney and other representatives of Dresser met with members of the SEC staff to discuss a proposed filing. At the meeting Dresser agreed to conduct an internal inquiry into questionable foreign payments, in accordance with the terms of the Voluntary Disclosure Program.[10] The next day Dresser submitted a Form 8–K describing, in generic terms, one questionable foreign payment. Joint Appendix (JA) 100–102. On November 11, 1976 Dresser filed a second Form 8–K reporting the results of the internal investigation. JA 103–108. On February 10, 1977 the company supplemented this report with a third Form 8–K concerning a questionable payment not reported in the earlier reports. JA 109–113. The reports concerned Dresser's foreign activities after November 1, 1973. All disclosures were in generic, not specific, terms.

As part of its general monitoring program the SEC staff requested access to the documents underlying Dresser's report. On July 15, 1977 Dresser refused to grant such access. The company argued that allowing the staff to make notes or copies might subject its documents to public disclosure through the Freedom of Information Act.[11] Dresser stated that such disclosure could endanger certain of its employees working abroad.[12] During the ensuing discussions with the staff Dresser attempted to impose conditions of confidentiality upon any SEC

examination of its documents, but the staff did not agree.[13] Instead, it issued a recommendation to the Commission for a formal order of investigation in the Dresser case. This recommendation was predicated on the staff's conclusions that Dresser:

1. may have used corporate funds for non-corporate purposes;

2. may have made false and misleading statements concerning the existence of and circumstances surrounding material obligations of Dresser to certain foreign governments and to other entities; and

3. may have made false entries and caused false entries to be made upon the books and records of Dresser, and its affiliates and subsidiaries with respect to, among other things, payments to foreign government officials.

JA 7–8 (order directing private investigation and designating officers to take testimony). Moreover, the staff reported that Dresser's proxy soliciting materials, reports, and statements may have been misleading with respect to the potential risks involved in its conduct of business through questionable foreign payments, and may have included false statements in connection with such payments. JA 8. Dresser vigorously opposed issuance of an order of investigation.[14]

Meanwhile, the Department of Justice had established a task force on transnational payments to investigate possible criminal violations arising from illegal foreign payments. Two SEC attorneys participated in the task force. In the summer of 1977 the Justice task force requested access to SEC files on the approximately 400 companies, including Dresser, that had participated in

---

**9.** *Id.* at 9 n.8.

**10.** The meeting is described by Mr. W. Lyall Milde in a deposition *reprinted in* Joint Appendix (JA) 64–66.

**11.** JA 71–76.

**12.** JA 74.

**13.** The staff offered to give Dresser 10 days notice before releasing any Dresser documents to the public, to enable the company to challenge such release in court. JA 12.

**14.** *See* JA 77 *et seq.*

the Voluntary Disclosure Program.[15] Pursuant to Commission authorization the SEC staff transmitted all such files to the Justice task force in August 1977.[16] After its preliminary investigation of the Form 8–K's submitted by Dresser under the Voluntary Disclosure Program, Justice presented Dresser's case to a grand jury in the District of Columbia on January 25, 1978.

Before any summons or subpoena had issued in either the SEC or the grand jury investigation, Dresser filed suit in the Southern District of Texas against the SEC and Justice to enjoin any further investigation of it by either agency.[17] While Dresser's suit was pending in the Southern District of Texas, the District of Columbia grand jury subpoenaed Dresser's documents on April 21, 1978. At roughly the same time the SEC issued a formal order of private investigation, authorizing the staff to subpoena the documents and to obtain other relevant evidence. JA 7–9 (April 11, 1978). Pursuant to that order the staff issued a subpoena *duces tecum*, returnable on May 4, 1978. JA 14–16 (April 21, 1978). This subpoena covered substantially the same documents and materials subpoenaed by the grand jury, and more. Dresser did not respond to the subpoena.[18]

On May 1, 1978 the District Court in Houston, Texas dismissed Dresser's suit against Justice without opinion. Three days later, after the period for compliance with its subpoena had lapsed, the SEC applied to the District Court for the District of Columbia for enforcement. In the meantime, Dresser had appealed the adverse judgment in the Texas action to the Fifth Circuit, and sought interim relief. On May 5 Judge Coleman of the Fifth Circuit enjoined further prosecution of the SEC subpoena enforcement action until after the District Court for the Southern District of Texas had ruled on Dresser's action against

the SEC. Judge Coleman also obtained a stipulation from Justice that Justice would not require Dresser or its agents to appear before the grand jury until after the Company had filed a motion to quash the grand jury subpoena in the District of Columbia and had received a ruling on such motion.

On May 8, 1978 Dresser filed a motion to quash the grand jury subpoena in the District Court for the District of Columbia. On May 19 the District Court (Parker, J.) denied Dresser's motion to quash, but imposed a protective order requiring strict confidentiality in accordance with Rule 6(e) of the Federal Rules of Criminal Procedure. In imposing the protective order the court stated that the "concern of Dresser and especially its employees is not illusory and should not be lightly considered." *See* JA 163. This was in reference to Dresser's argument that public disclosures of the names, places, and dates connected with its questionable foreign payments could endanger the lives of its employees in certain turbulent foreign countries. Dresser thereafter complied with this grand jury subpoena.

On May 26, 1978 the Southern District of Texas dismissed Dresser's action against the SEC without reaching the merits. Dresser appealed to the Fifth Circuit and on June 8 obtained an order from the court that:

> Until the appeal in this case shall have been decided in this court, and except for proceedings before the Grand Jury in the District of Columbia, the Securities and Exchange Commission, its officers and employees, are enjoined to preserve inviolate the confidentiality of any information obtained by the subpoena here in issue. This order is not intended to interfere with pending proceedings in the District of Columbia to enforce the SEC subpoenas.

---

**15.** JA 295–296 (statement by Marvin G. Pickholz).

**16.** *Id.*

**17.** *Dresser Industries, Inc. v. United States,* Civil Action No. H–78–405 (S.D.Tex.).

**18.** The procedural history of this case is recounted in Dresser's motion to quash the SEC subpoena, JA 160–163.

JA 202. On June 2, 1978 the District Court for the District of Columbia issued an order to Dresser to show cause why it should not be required to appear, give testimony, and produce records in obedience to the SEC subpoena. JA 141. On June 7 Dresser filed a motion for leave to obtain discovery from the SEC concerning the agency's alleged bad faith and attempted abuse of the judicial process, JA 27, and on June 13 filed a motion to quash the SEC subpoena. JA 160.

The District Court (Flannery, J.) denied Dresser's motion to compel discovery on June 16, without opinion. Judge Flannery explained in court that he had carefully examined the papers filed by Dresser, that discovery is rarely necessary in subpoena enforcement cases, and that he did not think this was an appropriate case for it. JA 256. Then, on June 30, 1978, the District Court (Flannery, J.) issued a memorandum opinion and order rejecting all of Dresser's objections to the SEC subpoena and requiring Dresser to comply with the subpoena within ten days after notice from the SEC. JA 301, reported at 453 F.Supp. 573 (D.D.C.1978). Rehearing was denied on July 15. This appeal followed.

Meanwhile, the United States Court of Appeals for the Fifth Circuit affirmed the decisions of the District Court for the Southern District of Texas dismissing Dresser's actions against Justice and the SEC in that court, largely on ripeness grounds. Dresser Industries, Inc. v. United States, 596 F.2d·1231 (5th Cir. 1979), cert. denied, 444 U.S. 1044, 100 S.Ct. 731, 62 L.Ed.2d 730 (1980). Accordingly, the interlocutory injunction requiring the SEC to preserve inviolate the confidentiality of Dresser's materials pending a decision on appeal was dissolved.

Having set forth the complicated procedural history of this case, we turn now to the principles that govern parallel administrative and criminal proceedings concerning the same conduct.

19. See generally Note, Concurrent Civil and Criminal Proceedings, 67 Colum.L.Rev. 1277 (1967).

## II. GENERAL PRINCIPLES

### A. Parallel Investigations

The civil and regulatory laws of the United States frequently overlap with the criminal laws, creating the possibility of parallel civil and criminal proceedings, either successive or simultaneous.[19] In the absence of substantial prejudice to the rights of the parties involved, such parallel proceedings are unobjectionable under our jurisprudence. As long ago as 1912 the Supreme Court recognized that under one statutory scheme—that of the Sherman Act—a transaction or course of conduct could give rise to both criminal proceedings and civil suits. Standard Sanitary Manufacturing Co. v. United States, 226 U.S. 20, 52, 33 S.Ct. 9, 16, 57 L.Ed. 107 (1912). The Court held that the government could initiate such proceedings either "simultaneously or successively," with discretion in the courts to prevent injury in particular cases. Id. It explained:

> The Sherman Act provides for a criminal proceeding to punish violations and suits in equity to restrain such violations, and the suits may be brought simultaneously or successively. The order of their bringing must depend upon the Government; the dependence of their trials cannot be fixed by a hard and fast rule or made imperatively to turn upon the character of the suit. Circumstances may determine and are for the consideration of the court. An imperative rule that the civil suit must await the trial of the criminal action might result in injustice or take from the statute a great deal of its power. * * *

Id.

The Supreme Court returned to this theme in United States v. Kordel, 397 U.S. 1, 90 S.Ct. 763, 25 L.Ed.2d 1 (1970). In that case the Food and Drug Administration (FDA) investigated a company and certain of its officers in connection with possible

violations of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* Early in the investigation the FDA recommended and the United States Attorney filed an *in rem* action in federal district court seeking civil seizure of certain products. In connection with this suit the FDA filed extensive interrogatories with the company. Before the company had responded the FDA notified it that the agency was contemplating a criminal proceeding against it in connection with the same alleged violations of the statute. The company therefore moved to stay civil proceedings or, in the alternative, to extend the time for answering the interrogatories until after disposition of the criminal proceedings. The District Court denied this motion. Thereafter, but still before the company had filed its answers to the interrogatories, the regional and divisional offices of the FDA formally recommended criminal prosecution to the General Counsel. After it received the answers, the Department of Health, Education, and Welfare formally recommended criminal prosecution to the Justice Department. Justice obtained an indictment, and subsequently convictions. The case reached the Supreme Court upon appeal of the convictions of several of the company's officers.

The officers in *Kordel* argued that use of the civil discovery process to compel answers to interrogatories that could be used to build the government's case in a parallel criminal proceeding "reflected such unfairness and want of consideration for justice" as to require reversal. 397 U.S. at 11, 90 S.Ct. at 769. The Supreme Court did not agree. The Court noted that the government had not brought the civil action "solely to obtain evidence for its criminal prosecution," *id.* at 11–12, 90 S.Ct. at 769, or without notice to the defendants that it contemplated a criminal action, *id.* at 12, 90 S.Ct. at 769. Moreover, the defendant was not unrepresented by counsel, *id.*, and had no reason to fear "prejudice from adverse pretrial publicity or other unfair injury," *id.* Nor were there any other "special circumstances" suggesting that the parallel pro-

ceedings were unconstitutional or improper. *Id.* In the absence of such "special circumstances" the Court recognized that prompt investigation of both civil and criminal claims can be necessary to the public interest. It said:

> The public interest in protecting consumers throughout the Nation from misbranded drugs requires prompt action by the agency charged with responsibility for administration of the federal food and drug laws. But a rational decision whether to proceed criminally against those responsible for the misbranding may have to await consideration of a fuller record than that before the agency at the time of the civil seizure of the offending products. It would stultify enforcement of federal law to require a governmental agency such as the FDA invariably to choose either to forgo recommendation of a criminal prosecution once it seeks civil relief, or to defer civil proceedings pending the ultimate outcome of a criminal trial.

*Id.* at 11, 90 S.Ct. at 769 (footnote omitted).

■ The Constitution, therefore, does not ordinarily require a stay of civil proceedings pending the outcome of criminal proceedings. *See Baxter v. Palmigiano*, 425 U.S. 308, 98 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *DeVita v. Sills*, 422 F.2d 1172, 1181 (3d Cir. 1970). Nevertheless, a court may decide in its discretion to stay civil proceedings, postpone civil discovery, or impose protective orders and conditions "when the interests of justice seem[ ] to require such action, sometimes at the request of the prosecution, * * * sometimes at the request of the defense[.]" *United States v. Kordel, supra,* 397 U.S. at 12 n.27, 90 S.Ct. at 770 (citations omitted); *see Horne Brothers, Inc. v. Laird,* 463 F.2d 1268, 1271–1272 (D.C.Cir.1972). The court must make such determinations in the light of the particular circumstances of the case.

Other than where there is specific evidence of agency bad faith or malicious governmental tactics, the strongest case for

deferring civil proceedings until after completion of criminal proceedings is where a party under indictment for a serious offense is required to defend a civil or administrative action involving the same matter. The noncriminal proceeding, if not deferred, might undermine the party's Fifth Amendment privilege against self-incrimination, expand rights of criminal discovery beyond the limits of Federal Rule of Criminal Procedure 16(b), expose the basis of the defense to the prosecution in advance of criminal trial, or otherwise prejudice the case.[20] If delay of the noncriminal proceeding would not seriously injure the public interest, a court may be justified in deferring it. *See, e.g., United States v. Henry,* 491 F.2d 702 (6th Cir. 1974); *Texaco, Inc. v. Borda,* 383 F.2d 607, 608–609 (3d Cir. 1967); *Silver v. McCamey,* 221 F.2d 873, 874–875 (D.C.Cir. 1955).[21] Such cases have frequently arisen in the tax field, following the leading case of *United States v. O'Connor,* 118 F.Supp. 248 (D.Mass.1953). *Cf. Boren v. Tucker,* 239 F.2d 767, 772–773 (9th Cir. 1956) (distinguishing IRS summons enforcement before and after indictment). In some such cases, however, the courts may adequately protect the government and the private party by merely deferring civil discovery or entering an appropriate protective order. *Gordon v. FDIC,* 427 F.2d 578, 580–581 (D.C.Cir.1970). The case at bar is a far weaker one for staying the administrative investigation. No indictment has been returned; no Fifth Amendment privilege is threatened; Rule 16(b) has not come into effect; and the SEC subpoena does not require Dresser to reveal the basis for its defense.

**B. SEC Investigations**

The case at bar concerns enforcement of the securities laws of the United States, especially the Securities Act of 1933 ('33 Act), 48 Stat. 74, 15 U.S.C. § 77a *et seq.* (1976), and the Securities Exchange Act of 1934 ('34 Act), 48 Stat. 881, 15 U.S.C. § 78a *et seq.* (1976). These statutes explicitly empower the SEC to investigate possible infractions of the securities laws with a view to both civil and criminal enforcement, and to transmit the fruits of its investigations to Justice in the event of potential criminal proceedings. The '34 Act provides in relevant part: "The Commission may, in its discretion, make such investigations as it deems necessary to determine whether any person has violated, is violating, or is about to violate any provision of this chapter[.]" Section 21(a) of the '34 Act, 15 U.S.C. § 78u(a) (1976). This investigative authority includes the power to administer oaths and affirmations, subpoena witnesses, take evidence, and require production of any books, papers, correspondence, memoranda, or other records which the SEC deems relevant or material. *Id.,* Section 21(b), 15 U.S.C. § 78u(b). If it determines that a person "is engaged or is about to engage in acts or practices constituting a violation" of the Act, the SEC may bring an action in federal district court to enjoin such acts or practices. *Id.,* Section 21(d), 15 U.S.C. § 78u(d). Under the same subsection of the '34 Act the SEC may "transmit such evidence as may be available concerning such acts or practices * * * to the Attorney General, who may, in his discretion, institute the necessary criminal proceedings under this chapter." *Id.* The '33 Act is to similar effect. *See* Sections 19(b), 20(a), (b)

---

**20.** In some cases the government seeks postponement of the noncriminal proceeding, to prevent the criminal defendant from broadening his rights of criminal discovery against the government. *E.g., Campbell v. Eastland,* 307 F.2d 478 (5th Cir. 1962), *cert. denied,* 371 U.S. 955, 83 S.Ct. 502, 9 L.Ed.2d 502 (1963).

**21.** *Silver v. McCamey,* 221 F.2d 873 (D.C.Cir. 1955), held that "due process is not observed if an accused person is subjected, without his consent, to an administrative hearing on a serious criminal charge that is pending against him." *Id.* at 874–875. As we have noted in

text, cases decided since *Silver* have established that, as a general matter, due process is not infringed merely because an accused person is subjected, without his consent, to an administrative hearing concerning matters involved in a pending criminal proceeding. Nevertheless, as *Silver* recognized and more recent cases have affirmed, such an administrative proceeding can in some circumstances prejudice the rights of a citizen or the government. In such cases the agencies and courts may have a duty to take appropriate corrective action.

of the '33 Act, 15 U.S.C. §§ 77s(b), 77t(a), (b) (1976).[22]

 Effective enforcement of the securities laws requires that the SEC and Justice be able to investigate possible violations simultaneously. Dissemination of false or misleading information by companies to members of the investing public may distort the efficient workings of the securities markets and injure investors who rely on the accuracy and completeness of the company's public disclosures. If the SEC suspects that a company has violated the securities laws, it must be able to respond quickly: it must be able to obtain relevant information concerning the alleged violation and to seek prompt judicial redress if necessary. Similarly, Justice must act quickly if it suspects that the laws have been broken. Grand jury investigations take time, as do criminal prosecutions. If Justice moves too slowly the statute of limitations may run, witnesses may die or move away, memories may fade, or enforcement resources may be diverted. *See United States v. Fields,* 592 F.2d 638, 646 (2d Cir. 1978), *cert. denied,* 442

U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979). The SEC cannot always wait for Justice to complete the criminal proceedings if it is to obtain the necessary prompt civil remedy; neither can Justice always await the conclusion of the civil proceeding without endangering its criminal case. Thus we should not block parallel investigations by these agencies in the absence of "special circumstances" in which the nature of the proceedings demonstrably prejudices substantial rights of the investigated party or of the government. *See United States v. Kordel, supra,* 397 U.S. at 11–13, 90 S.Ct. at 769–770.

## III. APPLICABILITY OF

### *United States v. LaSalle Nat'l Bank*

[3] Dresser principally relies on an analogy to *United States v. LaSalle Nat'l Bank,* 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978),[23] in which the Supreme Court said in dictum that the Internal Revenue Service (IRS) may not use its summons authority to investigate possible violations of the tax laws after it has referred those violations to

---

**22.** Sections 20(a) and 19(b) of the '33 Act provide the basis for the SEC's investigative authority:

 Whenever it shall appear to the Commission, either upon complaint or otherwise, that the provisions of this subchapter, or of any rule or regulation prescribed under authority thereof, have been or are about to be violated, it may, in its discretion, either require or permit such person to file with it a statement in writing, under oath, or otherwise, as to all the facts and circumstances concerning the subject matter which it believes to be in the public interest to investigate, and may investigate such facts.

Section 20(a) of the '33 Act, 15 U.S.C. § 77t(a) (1976).

 For the purpose of all investigations which, in the opinion of the Commission, are necessary and proper for the enforcement of this subchapter, any member of the Commission or any officer or officers designated by it are empowered to administer oaths and affirmations, subpena witnesses, take evidence, and require the production of any books, papers, or other documents which the Commission deems relevant or material to the inquiry.
 \* \* \*

*Id.* § 19(b), 15 U.S.C. § 77s(b). From § 20(b) derives the authority to initiate civil injunctive actions and to transmit evidence to Justice:

 Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this subchapter, or of any rule or regulation prescribed under authority thereof, it may[,] in its discretion, bring an action in any district court of the United States or United States court of any Territory, to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices to the Attorney General who may, in his discretion, institute the necessary criminal proceedings under this subchapter. \* \* \*

*Id.* § 20(b), 15 U.S.C. § 77t(b).

**23.** Dresser's other arguments, in summary, are (1) that the SEC subpoena breached an enforceable agreement of confidentiality with Dresser; (2) Dresser was erroneously denied certain discovery rights; and (3) enforcement of the subpoena might violate Dresser's attorney-client privilege. *See* brief of respondent-appellant at 11–12. These arguments are discussed in Part V *infra.*

Justice for criminal prosecution. *See id.* at 311–313, 98 S.Ct. at 2365.[24] Dresser argues that the SEC's transmittal of Dresser's file to Justice was equivalent to a "referral" under *LaSalle*, and thus that the SEC's power to enforce investigative subpoenas against Dresser in connection with that file lapsed at that time. Alternatively, Dresser suggests that, even if transmittal of the file was not analogous to a "referral" under *LaSalle*, initiation of the grand jury investigation precluded subsequent enforcement of SEC investigative subpoenas into the same matters.

These two alternatives are vulnerable to the same objection: the *LaSalle* rule applies solely to the statutory scheme of the Internal Revenue Code, in which the IRS's civil authority ceases for all practical purposes upon referral of a taxpayer's case to Justice; it does not apply to the securities laws, in which the SEC's civil enforcement authority continues undiminished after Jus-

tice initiates a criminal investigation by the grand jury.[25]

The IRS summons authority derives from Section 7602 of the Internal Revenue Code, 26 U.S.C. § 7602 (1976). Its authority is restricted to the terms and purposes of that provision. The Supreme Court said in *LaSalle*:

> In § 7602 Congress has bestowed upon the Service the authority to summon production for four purposes only: for "ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax . . . or collecting any such liability." Congress therefore intended the summons authority to be used to aid the determination and collection of taxes. These purposes do not include the goal of filing criminal charges against citizens. * *

---

**24.** This portion of *LaSalle* is properly characterized as dictum, because the controversy concerned investigation of a taxpayer *prior* to referral to Justice. The Court held that a taxpayer challenging an IRS summons prior to such referral bears the heavy burden of showing that the summons was issued in "bad faith," 437 U.S. at 316, 98 S.Ct. at 2367, which the Court interpreted as being "solely [for] criminal purposes." *Id.* The Supreme Court has never decided a case concerning an IRS summons issued after referral to Justice but before indictment. *See* note 25 *infra*.

**25.** The *LaSalle* rule—prohibiting enforcement of an IRS summons after the IRS had referred the case to Justice for criminal prosecution—derives from *Donaldson v. United States*, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed. 580 (1971). In *Donaldson* the Court said:

> We hold that under § 7602 [of the Internal Revenue Code, 26 U.S.C. § 7602 (1970)] an internal revenue summons may be issued in aid of an investigation if it is issued in good faith and prior to a recommendation for criminal prosecution.

*Id.* at 536, 91 S.Ct. at 545. The *Donaldson* Court recognized that under prior precedent the limitation on the IRS summons authority came into effect only in "the situation of a *pending criminal charge* or, at most, of an investigation solely for criminal purposes." *Id.* at 533, 91 S.Ct. at 544 (emphasis added). *See Reisman v. Caplin*, 375 U.S. 440, 449, 84 S.Ct. 508, 513, 11 L.Ed.2d 459 (1964) (*citing Boren v. Tucker*, 239 F.2d 767, 772–773 (9th Cir. 1956)). "Any other holding," according to the *Donald-*

*son* Court, "would thwart and defeat the appropriate investigatory powers that the Congress has placed in 'the Secretary or his delegate.' " 400 U.S. at 533, 91 S.Ct. at 544. Nevertheless, after a detailed discussion of the enforcement scheme of the Internal Revenue Code, the Court reiterated the rule in modified form: instead of prohibiting enforcement of an IRS summons if there is a *pending criminal charge*, the Court prohibited such enforcement if there had been a *referral to Justice for criminal prosecution*. *Compare* 400 U.S. at 533, 91 S.Ct. at 543, *with id.* at 536, 91 S.Ct. at 545. Obviously, the difference between these two formulations is substantial. The Court did not explicitly state why it shifted from the one to the other, but the best available explanation lies in its discussion of the statutory scheme, which appears between the two conflicting statements of the rule. In *LaSalle* Justice Blackmun, who also wrote the opinion for the Court in *Donaldson*, explained that the decision in *Donaldson* was not predicated on its analysis of precedent. *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 307, 98 S.Ct. 2357, 2362, 57 L.Ed.2d 221 (1978). Rather, the decision relied on its review of the statutory scheme. *Id.* "The validity of the summonses depended ultimately on whether they were among those authorized by Congress," the Justice said. *Id.* This emphasizes that the rule espoused in *LaSalle* and *Donaldson* is not based on principles generally applicable to parallel civil and criminal proceedings, but on limitations unique to the IRS.

*United States v. LaSalle Nat'l Bank, supra,* 437 U.S. at 316–317 n.18, 98 S.Ct. at 2367 n.18 (first ellipsis in original).

In the pre-referral stage of an IRS investigation the civil and criminal elements of the investigation are intertwined. *Id.* at 308–311, 98 S.Ct. at 2363–2364. The same information is useful in negotiating with the taxpayer, in suing in court for additional taxes, or in deciding whether to recommend criminal prosecution. Thus the IRS at that stage is empowered to issue investigative summonses under Section 7602, even though the fruits of such summonses may be useful for the illegitimate purpose of "filing criminal charges against citizens" as well as the legitimate purposes of determining and collecting taxes.

However, upon referral of the case to Justice with a recommendation for criminal prosecution, "the criminal and civil aspects of a tax fraud case begin to diverge." *Id.* at 311, 98 S.Ct. at 2365. After that point the IRS loses its ability to compromise the case, either criminally or civilly. All such authority devolves upon Justice. *Id.* at 312, 98 S.Ct. at 2365. Although theoretically the IRS might use its summons power during the pendency of the criminal proceeding to discover information for the purpose of a future civil tax suit, *id.* at 311–312, 98 S.Ct. at 2364–2365, in practice the IRS holds all civil action in abeyance until the criminal proceeding is completed.[26] Only then does the IRS turn its attention again to the civil aspects of the case.

Thus, in the *LaSalle* Court's view, the authorized purposes for summonses under Section 7602 cease as a practical matter during the pendency of the criminal proceeding. Because of this the Court was willing to impose a "prophylactic" rule flatly forbidding *any* use of the Section 7602 authority once a case has been referred to Justice for criminal prosecution. *Id.* at 312, 98 S.Ct. at 2365. This rule restricts the IRS within the confines of its statutory authority and also "safeguards * * * two poli-

cy interests," *id.* at 313, 98 S.Ct. at 2365. These interests are to avoid broadening the Justice Department's right of criminal litigation discovery and to avoid infringing on the role of the grand jury as a principal tool of criminal accusation. *Id.* at 312, 98 S.Ct. at 2365.

Dresser asks this court to extend the reasoning of *LaSalle* to govern the conduct of the SEC under the securities laws. But IRS investigative and enforcement proceedings are not analogous to those of the SEC. The language of the securities laws and the nature of the SEC's civil enforcement responsibilities require that the SEC retain full powers of investigation and civil enforcement action, even after Justice has begun a criminal investigation into the same alleged violations.

The investigative provisions of the securities laws are far broader than Section 7602 of the Internal Revenue Code, as interpreted in *LaSalle*. *See SEC v. Arthur Young & Co.,* 584 F.2d 1018, 1022–1024 (D.C.Cir.1978), *cert. denied,* 439 U.S. 1071, 99 S.Ct. 841, 59 L.Ed.2d 37 (1979). SEC investigations are not confined to "four purposes only." *Cf. United States v. LaSalle Nat'l Bank, supra,* 437 U.S. at 316 n.18, 98 S.Ct. at 2367 n.18. Rather, the SEC may, "*in its discretion,* make such investigations as *it deems necessary* to determine whether any person has violated, is violating, or is about to violate any provision" of the '34 Act, Section 21(a) of the '34 Act, 15 U.S.C. § 78u(a) (1976) (emphasis added). Moreover, the SEC is "authorized *in its discretion* * * * to investigate *any* facts, conditions, practices, or matters which *it may deem necessary or proper* to aid in the enforcement of such provisions, in the prescribing of rules and regulations under this chapter, or in securing information to serve as a basis for recommending further legislation concerning matters to which this chapter relates." *Id.* (emphasis added). *See also* Section 19(b) of the '33 Act, 15 U.S.C. § 77s(b) (1976). Given this broad statutory mandate, there is

---

**26.** *See* Policies of the IRS Handbook, P–4–84, *reprinted in* 1 CCH Internal Revenue Manual 1305–1310 (1978); Office of the Chief Counsel, IRS, Civil Considerations in Pending Criminal Matters, Order No. 3050.1 (March 23, 1978).

virtually no possibility that in issuing this subpoena the SEC was acting *ultra vires.* The investigation of Dresser—based as it was on the staff's conclusion that Dresser may have engaged in conduct seriously contravening the securities laws [27]—falls squarely within the Commission's explicit investigatory authority.[28] Unlike the Internal Revenue Code as interpreted in *LaSalle,* the securities laws offer no suggestion that the scope of the SEC's investigative authority shrinks when a grand jury begins to investigate the same matters. Since the validity of summonses or subpoenas "depend[s] ultimately on whether they were among those authorized by Congress," *United States v. LaSalle Nat'l Bank, supra,* 437 U.S. at 307, 98 S.Ct. at 2362, we conclude that this subpoena is enforceable under the rule of that case.[29]

Fulfillment of the SEC's civil enforcement responsibilities requires this conclusion. Unlike the IRS, which can postpone collection of taxes for the duration of parallel criminal proceedings without seriously injuring the public, the SEC must often act quickly, lest the false or incomplete statements of corporations mislead investors and infect the markets. Thus the Commission must be able to investigate possible securities infractions and undertake civil enforcement actions even after Justice has begun a criminal investigation. For the SEC to stay its hand might well defeat its purpose.

Dresser attempts to prevent enforcement of this subpoena by invoking the "policy interests" identified by the *LaSalle* Court: to avoid broadening Justice's right of criminal litigation discovery and to avoid infringing the role of the grand jury as a principal tool of criminal accusation. Brief of respondent-appellant at 21–23; supplemental brief of appellant Dresser Industries, Inc. at 10–21; *see United States v. LaSalle Nat'l Bank, supra,* 437 U.S. at 312, 98 S.Ct. at 2365. We reject this argument for two reasons.

First, Dresser disregards the context in which these "policy interests" arose in *La-Salle.* Only after the Court had determined that the IRS had no practical authorized purpose for issuing a summons after referral of a case to Justice did it direct its attention to these "policy interests." Then it did so solely to explain its imposition of a "prophylactic" rule forbidding *any use* of the IRS summons authority after referral to Justice, as opposed to forbidding only such uses as are unrelated to the purposes of Section 7602.[30] The Court did not impose such a "prophylactic" rule in any situation where it would significantly restrict the legitimate investigative authority of the

---

27. *See* text at note 14 *supra.*

28. Dresser argued unsuccessfully in the District Court that the SEC had exceeded its authority by issuing the subpoena where there was no likelihood that a violation had been or was about to be committed. 453 F.Supp. at 575. On appeal Dresser makes this argument only obliquely, in the form of an objection to the denial of discovery. Brief of respondent-appellant at 39–42. In any event, the argument is without merit. Our task is merely to ensure that "the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." *SEC v. Arthur Young & Co.,* 584 F.2d 1018, 1024 (D.C.Cir.1978), *cert. denied,* 439 U.S. 1071, 99 S.Ct. 841, 59 L.Ed.2d 37 (1979) (*quoting United States v. Morton Salt Co.,* 338 U.S. 632, 652–653, 70 S.Ct. 357, 368–369, 94 L.Ed. 401 (1950)); *see also SEC v. Howatt,* 525 F.2d 226, 229 (1st Cir. 1975). We agree with the District Court that "[t]his investigation has a

legitimate purpose and the inquiry is relevant to that purpose." 453 F.Supp. at 576.

29. *Cf. SEC v. OKC Corp.,* 474 F.Supp. 1031, 1038 (N.D.Tex.1979) (SEC subpoena enforced although Department of Energy had made *criminal reference to Justice in related matter).*

30. *See United States v. LaSalle Nat'l Bank, supra* note 25, 437 U.S. at 311–312, 98 S.Ct. at 2365:

> We recognize, of course, that even upon recommendation to the Justice Department, the civil and criminal elements do not separate completely. The Government does not sacrifice its interest in unpaid taxes just because a criminal prosecution begins. Logically, then, the IRS could use its summons authority under § 7602 to uncover information about the tax liability created by a fraud regardless of the status of the criminal case. But the rule forbidding such is a prophylactic intended to safeguard the following policy interests.

IRS.[31] In the case of an SEC investigation there is no call for a "prophylactic rule," and thus no need to ponder the import of these "policy interests," because the SEC's authority to issue the subpoena remains undiminished after the start of a grand jury investigation.

Second, the "policy interests" of *LaSalle* have little practical significance in this context. The first—to avoid broadening Justice's right to criminal discovery—is flatly inapplicable, as Dresser admits.[32] The strict limitations on discovery in criminal cases, embodied in Federal Rules of Criminal Procedure 15–17, do not take effect until after a grand jury has returned an indictment. Until then there is no danger that Justice might broaden its discovery rights, because the subpoena power of the grand jury is as broad as—perhaps broader than—that of the SEC. Justice can procure from Dresser directly whatever materials it might procure indirectly through the SEC.[33] In fact, a party investigated under SEC rules instead of grand jury procedures is accorded far greater procedural protection, and has no cause to complain. *See* 17 C.F.R. §§ 203.6–203.7 (1979).[34]

In its brief Dresser has concentrated upon the second "policy interest" identified in *LaSalle* : avoiding infringement upon the role of the grand jury. Dresser sug-

**31.** The *LaSalle* Court underscored, in a footnote, its belief that a "prophylactic" rule need not be imposed in every circumstance presenting the potentiality for infringement of the grand jury's role or broadening of Justice's right to criminal discovery. The Court disapproved the position adopted by the Third Circuit in *United States v. Lafko*, 520 F.2d 622, 625 (3d Cir. 1975), which it characterized as holding that the IRS summons authority must cease at the point when the special agent recommends prosecution to the district office, rather than at the point when the IRS recommends prosecution to Justice. 437 U.S. at 313 n.15, 98 S.Ct. at 2365 n.15. The Supreme Court admitted that "the potential for expanding the criminal discovery rights of the Justice Department or for the usurping the role of the grand jury exists at the point of the recommendation by the special agent." *Id.* But it called the possibilities of abuse "remote," *id.*, and stated that they "do not justify imposing an absolute ban on the use of the summons before that point." *Id.*

**32.** Supplemental brief of appellant Dresser Industries, Inc. at 19 n.16.

**33.** *See Developments in the Law—Corporate Crime: Regulating Behavior Through Criminal Sanctions*, 92 Harv.L.Rev. 1227, 1312–1313 (1979). Obtaining the approval of the grand jury itself is not a serious impediment to Justice's efforts; indeed, the common practice is for grand jury subpoenas to be issued in blank, with the contents to be filled in by the prosecutor. *See In re Grand Jury Proceedings*, 486 F.2d 85, 87 (3d Cir. 1973).

**34.** 17 C.F.R. §§ 203.6–203.7 (1979) provide in relevant part:

§ 203.6 Transcripts.

* * * A person who has submitted documentary evidence or testimony in a formal investigative proceeding shall be entitled, upon written request, to procure a copy of his documentary evidence or a transcript of his testimony on payment of the appropriate fees: *Provided, however*, That in a nonpublic formal investigative proceeding the Commission may for good cause deny such request. In any event, any witness, upon proper identification, shall have the right to inspect the official transcript of the witness' own testimony.

§ 203.7 Rights of witnesses.

(a) Any person who is compelled or requested to furnish documentary evidence or testimony at a formal investigative proceeding shall upon request be shown the Commission's order of investigation. * * *

(b) Any person compelled to appear, or who appears by request or permission of the Commission, in person at a formal investigative proceeding may be accompanied, represented and advised by counsel * * *.

(c) The right to be accompanied, represented and advised by counsel shall mean the right of a person testifying to have an attorney present with him during any formal investigative proceeding and to have this attorney (1) advise such person before, during and after the conclusion of such examination, (2) question such person briefly at the conclusion of the examination to clarify any of the answers such person has given, and (3) make summary notes during such examination solely for the use of such person.

(d) Unless otherwise ordered by the Commission, in any public formal investigative proceeding, if the record shall contain implications of wrongdoing by any person, such person shall have the right to appear on the record; and in addition to the rights afforded other witnesses hereby, he shall have a reasonable opportunity of cross-examination and production of rebuttal testimony or documentary evidence. * * *

gests two ways in which the SEC civil investigation might infringe the role of the grand jury. First, it argues that enforcement of the SEC subpoena would undermine the secrecy protections of the grand jury because the SEC subpoena covers many or all of the Dresser documents that have already been subpoenaed by the grand jury.[35] In this argument Dresser misconceives the nature of the secrecy protections of the grand jury.

■ Federal Rule of Criminal Procedure 6(e) provides in relevant part:

(e) Secrecy of Proceedings and Disclosure

(1) *General rule.* A grand juror, an interpreter, a stenographer, an operator of a recording device, a typist who transcribes recorded testimony, an attorney for the Government, or any person to whom disclosure is made under paragraph (2)(A)(ii) of this subdivision shall not disclose matters occurring before the grand jury, except as otherwise provided for in these rules. No obligation of secrecy may be imposed on any person except in accordance with this rule. * * * We note that the Rule prohibits disclosure of "matters occurring before the grand jury[.]" This serves to protect the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, the deliberations or questions of jurors, and the like. It does not require, however, that a veil of secrecy be drawn over all matters occurring in the world that happen to be investigated by a grand jury.[36] It is well established that

when testimony or data is sought for its own sake—for its intrinsic value in the furtherance of a lawful investigation— rather than to learn what took place before the grand jury, it is not a valid defense to disclosure that the same information was revealed to a grand jury or that the same documents had been, or were presently being, examined by a grand jury. * * *

*United States v. Interstate Dress Carriers, Inc.,* 280 F.2d 52, 54 (2d Cir. 1960).[37] Dress-

---

**35.** Supplemental brief of appellant Dresser Industries, Inc. at 13–17.

**36.** The rationales for grand jury secrecy are well established:

"(1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witness who may testify before [the] grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt."

*Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 219 n.10, 99 S.Ct. 1667, 1673 n.10, 60 L.Ed. 156 (1979) (brackets in original) (*quoting United States v. Rose,* 215 F.2d 617, 628–629 (3d Cir. 1954), *approved in United States v. Proctor & Gamble Co.,* 356 U.S. 677, 681 n.6, 78 S.Ct. 983, 986 n.6, 2 L.Ed.2d 1077 (1958)). *See also* Note, *Administrative Agency Access to Grand Jury Materials,* 75 Colum.L.Rev. 162, 166 (1975) (suggesting a further rationale: "to prevent the grand jury from being diverted from its primary concern—the investigation of criminal activity"). None of these rationales has any application to an independent agency subpoena of corporate documents. No witnesses or targets will be frightened from testifying fully, no grand jurors will be threatened or suborned, no target will be embarrassed— any more than it might be embarrassed by any other SEC subpoena. Since the fact that Dresser is the target of a grand jury investigation is already public knowledge—as witness this case—there is no danger of exposing the identity of an innocent grand jury target.

**37.** *Accord, United States v. Stanford,* 589 F.2d 285, 290–291 (7th Cir. 1978), *cert. denied,* 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979); *In re Search Warrant for Second Floor Bedroom,* 489 F.Supp. 207 (D.R.I.1980); *In re Grand Jury Investigation of Ven-Fuel,* 441 F.Supp. 1299, 1302–1303 (M.D.Fla.1977); *Brink v. DaLesio,* 82 F.R.D. 664, 668–669 (D.Md. 1979); *Michelin Tire Corp. v. United States,* 453 F.Supp. 897, 898 (Cust.Ct.1978); *see also In re Grand Jury Investigation (Lance),* 610 F.2d 202, 217 (5th Cir. 1980); *State of Illinois v. Sarbaugh,* 552 F.2d 768, 771–772 (7th Cir.), *cert. denied,* 434 U.S. 889, 98 S.Ct. 262, 54 L.Ed.2d 174 (1977). Some courts have adopted a broad interpretation of "matters occurring before the grand jury" as documents that "may tend to reveal what transpired before the grand jury." *United States v. Armco Steel Corp.,* 458

er's documents at issue here were created for an independent corporate purpose, not directly related to the prospect of a grand jury investigation. The SEC has subpoenaed them directly from Dresser, without mention of the grand jury. They do not reveal what has occurred before the grand jury; they reveal only what has occurred in Dresser's foreign operations. *See United States v. Stanford*, 589 F.2d 285, 291 (7th Cir. 1978), *cert. denied*, 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979). The fact that a grand jury has subpoenaed documents concerning a particular matter does not insulate that matter from investigation in another forum.[38] In fact, if the grand jury proceedings are genuinely secret, other agencies and courts will not know the subject matter of the grand jury investigation and thus will not be able to determine whether their own inquiry would overlap that of the grand jury.

In this case Dresser is obligated under the securities laws to provide documents to the SEC in obedience to a lawful subpoena. The existence of a grand jury proceeding neither adds to nor detracts from Dresser's rights before the SEC. Whatever rights to secrecy or confidentiality Dresser may have are the product solely of the laws governing the SEC; they are unaffected by the parallel grand jury proceeding.

The second way in which Dresser argues that enforcement of this subpoena might infringe the role of the grand jury is that the SEC could interpret and selectively disclose parts of the subpoenaed information to the grand jury through Justice, thereby undermining the independence of the grand jury's inquiry.[39] Of course, this argument is purely speculative since, as Dresser is well aware,[40] the SEC's general policy is to grant Justice continuing access to the entirety of a given investigative file once the Commission formally grants access.[41] As of now the SEC has not received any confidential documents from Dresser, and thus we have had no opportunity to see how this policy operates in practice. It would be altogether inappropriate for this court to presume that the SEC will pre-select documents for release to Justice in order to prejudice the grand jury.

In another sense Dresser's complaint on this score has little practical significance. No one would suggest that the grand jurors, unassisted by accountants, lawyers, or others schooled in the arcana of corporate financial accounting, could sift through the masses of Dresser's corporate documents and arrive at a coherent picture of the company's foreign payments and disclosure practices. In this area, as in many areas of great complexity, the grand jurors are assisted—guided and influenced, in fact—not only by the United States Attorneys assigned to the investigation, but also by experts provided by the federal regulatory agencies with experience in the particular subject areas. This expert assistance is permitted under Rule 6(e), and it promotes the efficiency and rationality of the criminal investigative process. *See In re Perlin*, 589 F.2d 260 (7th Cir. 1978); *Robert Hawthorne, Inc. v. Director of IRS*, 406 F.Supp. 1098, 1106–1107 (E.D.Pa.1975); *Developments in the Law—Corporate Crime: Regulating Corporate Behavior Through Criminal Sanctions*, 92 Harv.L.Rev. 1227, 1314–1315 (1979). In this case two SEC agents have been assigned to Justice's task force on transnational payments to assist in the investigation of companies possibly involved

---

F.Supp. 784, 790 (W.D.Mo.1978); *accord, In re Grand Jury Investigation (Lance)*, *supra*, 610 F.2d at 216. Even under this test courts should permit disclosure of documents in the hands of private parties, independently identified and sought for a lawful and independent purpose.

**38.** We recognize that in some circumstances the courts have protected materials not technically within the range of Rule 6(e) where disclosure would jeopardize the effective functioning of the grand jury. *See In re Search Warrant for Second Floor Bedroom, supra* note 37, 489 F.Supp. at 211. This case presents no such problem.

**39.** Supplemental brief of appellant Dresser Industries, Inc. at 17–18.

**40.** *See id.* at 5 n.10.

**41.** *See* letter from James H. Schropp to this court dated April 3, 1979.

in illegal foreign payments.[42] There can be little doubt that the grand jury's deliberations will be influenced by the work of these SEC agents. Any additional influence that might arise as a result of enforcement of the SEC subpoena and transmittal of documents to Justice thereafter is likely to be inconsequential.[43]

Finally, we note that if Dresser is genuinely worried that the SEC might disclose only those documents prejudicial to the company, it may provide the grand jury with copies of *all* the documents it provides to the SEC, thereby obviating the danger. Alternatively, if Dresser obtains evidence that the SEC is in fact abusing its power to transmit documents to Justice, and is thereby distorting the grand jury's perception of the case, Dresser may apply to the courts at that time for appropriate relief.

We conclude that the danger that enforcement of this subpoena might infringe the role of the grand jury is too speculative and remote at this point to justify so extreme an action as denying enforcement of this subpoena.[44]

In essence, Dresser has launched this attack on the parallel SEC and Justice proceedings in order to obtain protection against the bare SEC proceeding, which it fears will result in public disclosure of sensitive corporate documents. The prejudice Dresser claims it will suffer from the parallel nature of the proceedings is speculative and undefined—if indeed Dresser would suffer any prejudice from it at all.[45] Any entitlement to confidential treatment of its documents must arise under the laws pertaining to the SEC; the fortuity of a parallel grand jury investigation cannot expand Dresser's rights in this SEC enforcement action. Thus Dresser's invocation of *La-Salle* can avail the company nothing.

## IV. COOPERATION BETWEEN SEC AND JUSTICE

In its initial decision in this case a panel of this court ruled that "the broad prophy-

---

**42.** See text following note 14 *supra*.

**43.** Dresser implicitly admits that it would be proper for the SEC to conduct and complete a civil investigation, and then to transmit all relevant materials to Justice for possible criminal prosecution. *See* supplemental brief of appellant Dresser Industries, Inc. at 22–24. Yet such a procedure would create as severe a problem of grand jury infringement as the procedure complained of in this case.

**44.** Dresser seeks to minimize the effect an order denying enforcement of this subpoena would have on the SEC's ability to carry out its mandate by suggesting that the SEC could continue its civil enforcement efforts through obtaining access to the grand jury materials under Rule 6(e)(2)(C)(i), which permits disclosure "when so directed by a court preliminarily to or in connection with a judicial proceeding[.]" This disregards the fact that some courts have held that the SEC must demonstrate a "particularized need" for grand jury materials in order to obtain access to them, *e.g., In re Grand Jury Investigation*, 414 F.Supp. 74, 76 (S.D.N.Y. 1976), and that administrative investigative proceedings may not be considered preliminary to or in connection with a judicial proceeding for purposes of the Rule. *See United States v. Bates*, —— F.2d —— (D.C.Cir. No. 79–1930, decided April 18, 1980) (*per curiam*) (concerning a Federal Maritime Commission investigation).

**45.** During oral argument before the panel Dresser's attorney was asked what prejudice the company suffered from the parallel proceedings. Transcript of oral argument at 49 (Dec. 11, 1978). He responded that Dresser was prejudiced in two ways. First, he complained that "the SEC does not have anywhere near the confidentiality protection that Rule 6(e) provides." Of course, this complaint is properly addressed to Congress, which explicitly granted the SEC the power to "publish" the results of its investigations. Section 21(a) of the '34 Act, 15 U.S.C. § 78u(a) (1976). We do not express any opinion on whether the SEC would be justified in exercising the power to publish in this case; we merely note that the Commission is not governed, and is not intended to be governed, by Rule 6(e). Second, the attorney invoked Dresser's "right to a fair criminal investigation, including the fact that the Rules of Discovery of the Federal Rules of Criminal Procedure apply to it." Transcript of oral argument at 49 (Dec. 11, 1978). If he was referring to Rule 16(b), then he was mistaken, for Rule 16(b) comes into play only after indictment. In fact, the grand jury's investigative powers are as broad as or broader than those of the SEC. Dresser cannot claim to be prejudiced by the breadth of the SEC investigative authority.

lactic rule enunciated in *LaSalle* is inappropriate where the SEC and the Justice Department are simultaneously pursuing civil and criminal investigations." Slip opinion at 18. The panel therefore affirmed the District Court and ordered enforcement of the SEC subpoena. Out of a concern that the SEC subpoena might somehow "subvert the limitations of criminal discovery," *id.*, however, the panel, with one judge dissenting, modified the terms of the subpoena enforcement order. It required that "once the Justice Department initiates criminal proceedings by means of a grand jury, the SEC may not provide the Justice Department with the fruits of the Commission's civil discovery gathered after the decision to prosecute." *Id.* at 22.[46] We affirm the judgment of the District Court and reject the panel's modification.

First, we note that no party to this case had suggested or requested a modification such as that imposed by the panel majority, either in the District Court or in this court.[47] In supplemental briefs submitted to the *en banc* court both the SEC and Justice vigorously oppose the modification, while Dresser's support for it is lukewarm at most. Dresser had argued that the SEC investigation is flatly prohibited by the rule of *LaSalle* ; the panel's modification, according to Dresser, "may have had a similar effect" to that of *LaSalle* —"though not as assured in its operation." Supplemental brief of appellant Dresser Industries, Inc. at 30. Dresser characterized the panel's decision to "relax" the *LaSalle* rule as "unsound," *id.* at 29, and described the motivating factor in the panel's decision—the supposed need to protect the "criminal · discovery process * * * of the grand jury," slip opinion at 22—as "irrelevant to

this litigation." Supplemental brief of appellant Dresser Industries, Inc. at 9 n.16. The reactions of the parties, therefore, suggest that the panel's modification might serve more to impede securities law enforcement than to protect the interests of Dresser.

Second, we note that there is no support for the panel's modification in either the relevant statutes or legislative history. Both the '33 Act and the '34 Act—and other statutes related to securities law enforcement as well[48] —expressly authorize the SEC to "transmit such evidence as may be available * * * to the Attorney General, who may, in his discretion, institute the necessary criminal proceedings under this subchapter." Section 20(b) of the '33 Act, 15 U.S.C. § 77t(b) (1976); Section 21(d) of the '34 Act, 15 U.S.C. § 78u(d) (1976). The statutes impose no limitation on when this transmittal may occur. The parties have not cited any portions of the legislative histories of these Acts relevant to this question, nor have we found any. But the SEC and Justice find considerable support for their interpretation in the legislative history of the Foreign Corrupt Practices Act of 1977, 91 Stat. 1494, Title I, 15 U.S.C. §§ 78a, 78m, 78dd–1, 78dd–2, 78ff (Supp. I 1977).

The Foreign Corrupt Practices Act outlaws corporate ·bribery of foreign officials and associated inaccurate or misleading financial recordkeeping. In passing the statute Congress recognized the role of the SEC in combatting such practices under the '33 and '34 Acts, and sought to "strengthen the Commission's ability to enforce compliance with the existing reguirements [sic] of the securities laws[.]" S.Rep.No. 114, 95th Cong., 1st Sess. 12 (1977). Both the Senate and the House reports on the bill acknowl-

---

**46.** Under the panel's terminology the decision to prosecute and the beginning of "criminal discovery" occur at the time when Justice begins to present its case to the grand jury. *See* slip op. at 21. After indictment by the grand jury, when genuine criminal discovery under Rule 16(b) begins, different considerations would govern. *See* text and notes at notes 20–21 *supra* ; supplemental brief of the SEC at 23–24; supplemental brief of appellant Dresser Industries, Inc. at 9 n.16.

**47.** Mr. Luter, appellant in No. 78–1705, has taken no position regarding the panel's modification of the District Court's order.

**48.** Investment Company Act of 1940, § 42(e), 15 U.S.C. § 80a–41(e) (1976); Investment Advisers Act of 1940, § 209(e), 15 U.S.C. § 80b–9(e) (1976); Public Utility Holding Company Act of 1935, § 18(f), 15 U.S.C. § 79r(f) (1976).

edged the SEC's dual investigative role in preparing cases for civil and criminal enforcement actions. They also recognize the necessity of close cooperation between the SEC and Justice in preparing such cases. The Senate Committee said:

> The committee expects that close cooperation will develop between the SEC and the Justice Department at the earliest stage of any investigation in order to insure that the evidence needed for a criminal prosecution does not become stale. * * *

*Id.* at 12. It stated that it expected the SEC and Justice to "work out" between themselves certain "arrangements * * * on criminal matters" that would preserve the authority of each within its jurisdiction. *Id.* The House Committee said:

> Traditionally, there has been a close working relationship between the Justice Department and the SEC. The Committee fully expects that this cooperation between the two agencies will continue with respect to the enforcement of the provisions of this bill.

H.R.Rep.No. 640, 95th Cong., 1st Sess. 10 (1977).

Although the legislative history of the Foreign Corrupt Practices Act is not directly probative of congressional intent governing the '33 and '34 Acts, these statements by the 95th Congress are nevertheless entitled to some weight. The remarks in the committee reports concerning the investigative practices of the SEC and Justice were not intended to change, but to reaffirm, past practice. This indicates that Congress understands and approves of the "close working relationship" between the agencies in their investigative capacities. Since such a "close working relationship" will govern the activities of the agencies in enforcing the laws against questionable foreign payments under the new statute, it would be impractical for us to attempt to screen the agencies from each other when they are investigating the same sort of offense under the former statutes.

Congress manifestly did not intend that the SEC be forbidden to share information with Justice at this stage of the investigation. Under the panel majority's theory of the case the SEC would be foreclosed from sharing the fruits of its investigation with Justice as soon as Justice begins its own investigation through a grand jury. Only by waiting until the close of the SEC proceeding before initiating its own grand jury investigation could Justice obtain access to the evidence procured by the SEC. In view of Congress' concern that the agencies share information "at the earliest stage of any investigation in order to insure that the evidence needed for a criminal prosecution does not become stale," S.Rep.No. 114, *supra*, at 12, and that the agencies avoid "a costly duplication of effort," H.R.Rep.No. 640, *supra*, at 9, it would be unreasonable to prevent a sharing of information at this point in the investigation.

Third, we note that there is little or no judicial precedent for the panel's modification. The only support adduced by the panel opinion is a District Court opinion in *SEC v. Gilbert*, 79 F.R.D. 683 (S.D.N.Y.1978). In that case, which arose on the defendant's request for a protective order under the discovery rules of the Federal Rules of Civil Procedure—as contrasted to an investigative subpoena enforcement proceeding as in this case—the court ordered the SEC "not to furnish the U.S. Attorney specially with any information procured in the course of discovery in this case." *Id.* at 687. The court offered no authority for this order nor, indeed, any reason for its application. While we recognize the similarity of *Gilbert* to this case in many respects, its lack of reasoning and its distinguishable procedural posture make it but weak authority.[49]

In fact, the reasoning of the Supreme Court in *LaSalle* is contrary to that of the panel in two respects, and should govern this case in lieu of *Gilbert*. The *LaSalle*

**49.** The panel majority did not deal directly with two decisions much closer to the instant case on their facts. Both were decided in favor of the SEC without modification. *SEC v. Druck-*

*er*, [Transfer Binder 1979] Fed.Sec.L.Rep. (CCH) ¶ 96,821 (S.D.N.Y. March 30, 1979); *Gellis v. Casey*, 338 F.Supp. 651 (S.D.N.Y. 1972). *See* panel slip op. at 12 n.29, 14 n.31.

Court considered, and explicitly rejected, the course adopted by the panel majority: "[I]t is unrealistic to attempt to build a partial information barrier between the two branches of the executive." *United States v. LaSalle Nat'l Bank, supra,* 437 U.S. at 312, 98 S.Ct. at 2365. More fundamentally, the *LaSalle* Court conceived of the controversy before it as an analysis of the good or bad faith of the IRS investigation. A bad faith investigation, in the Court's conception, is one conducted solely for criminal enforcement purposes. *See id.* at 307–308, 316, & 316 n.18, 98 S.Ct. at 2362–2363, 2367 & 2367 n.18. Where the agency has a legitimate noncriminal purpose for the investigation, it acts in good faith under the *LaSalle* conception even if it might use the information gained in the investigation for criminal enforcement purposes as well.[50] In the present case the SEC plainly has a legitimate noncriminal purpose for its investigation of Dresser. It follows that the investigation is in good faith, in the absence of complicating factors. There is, therefore, no reason to impose a protective order such as that imposed by the panel majority.

Finally, we note that the panel's modification would serve no compelling purpose, and might interfere with enforcement of the securities laws by the SEC and Justice. As the Second Circuit has said, the procedure permitting the SEC to communicate with Justice during the preliminary stages of an investigation has "significant advantages." *United States v. Fields, supra,* 592 F.2d at 646.

Allowing early participation in the case by the United States Attorney minimizes statute of limitations problems. The more time a United States Attorney has, the easier it is for him to become familiar with the complex facts of a securities fraud case, to prepare the case, and to present it to a grand jury before expiration of the applicable statute of limitations. Earlier initiation of criminal proceedings moreover is consistent with a defendant's right to a speedy trial. * *

*Id.* The panel's modification would "interfere with this commendable example of inter-agency cooperation," *id.,* to the detriment of securities law enforcement and in contravention of the will of Congress.[51] On the other side of the balance, the panel's concern for preserving the limitations on criminal discovery is largely irrelevant at this stage of the proceedings, as Dresser agrees.[52] Thus this would be an inappropriate situation to impose a "prophylactic" rule against cooperation between the agencies. We believe the courts can prevent any injustice that may arise in the particular circumstances of parallel investigations in the future. We decline to adopt the position of the panel majority.

## V. OTHER ISSUES

Several issues remain.

First, Dresser argues that enforcing the SEC subpoena would breach an agreement of confidentiality made at the January 27, 1976 meeting between SEC and Dresser representatives. The District Court held that "[t]hroughout the voluntary disclosure program the SEC reserved its

---

**50.** So long as the Commission evinces no other indicium of bad faith. *See United States v. LaSalle Nat'l Bank, supra* note 25, 437 U.S. at 317 n.19, 98 S.Ct. at 2368 n.19.

**51.** In its brief Justice suggests a number of practical problems that might ensue from the panel's modification: (1) that Justice might have to forego any assistance from the SEC in enforcing the Foreign Corrupt Practices Act or other regulatory laws involving parallel investigations; (2) that agency attorneys might not be legitimately appointed as special assistant United States Attorneys to assist in preparing cases for grand juries; (3) that a grand jury witness might gain effective immunity from

criminal prosecution by providing sole, original copies of inculpatory documents to the SEC; (4) that prosecutors might be unable to learn of prior testimony by grand jury witnesses; (5) that prosecutors might be denied access to exculpatory information, evidence of perjury, or a prior inculpatory statement; and (6) that the prosecutor might find it impossible to comply with his responsibilities under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957).

**52.** *See* text at notes 33–34 *supra.*

rights to pursue a formal investigation and issue subpoenas if necessary. It is readily apparent that the SEC never agreed to completely forego its rights to subpoena the material in question." 453 F.Supp. at 575. We have examined the record and do not find that the District Court's determination on this point was clearly erroneous.

Second, Dresser argues that the District Court erred in granting judgment for the SEC without permitting Dresser to conduct discovery into the propriety of the SEC investigation. Although the precise nature of Dresser's desired discovery is not clear, the company apparently would investigate: (1) the SEC criminal referral and the concurrent criminal investigation, with a view to the possibility that the SEC has proceeded in bad faith; (2) the ethical propriety of SEC agents' participation in the criminal investigation; (3) the existence of an SEC commitment of confidentiality; and (4) the basis for the SEC staff's decision to request a formal investigation of Dresser. *See* brief of respondent-appellant at 36–42.

 We recognize that discovery may be available in some subpoena enforcement proceedings where the circumstances indicate that further information is necessary for the courts to discharge their duty. *United States v. Fensterwald,* 553 F.2d 231 (D.C.Cir.1977) (*per curiam*); *United States v. Wright Motor Co.,* 536 F.2d 1090 (5th Cir. 1976). For example, the Supreme Court in *LaSalle* apparently contemplated some degree of discovery in IRS summons cases to determine the institutional good faith of the IRS in issuing such summonses. *United States v. LaSalle Nat'l Bank, supra,* 437 U.S. at 316–317, 98 S.Ct. at 2367; *id.* at 320, 98 S.Ct. at 2369 (dissenting opinion); *United States v. Marine Midland Bank,* 585 F.2d 36, 38–39 (2d Cir. 1978) (*per curiam*). However, district courts must be cautious in granting such discovery rights, lest they transform subpoena enforcement proceedings into exhaustive inquisitions into the practices of the regulatory agencies. *See FTC v. Anderson,* 631 F.2d 741, at 747 (D.C.Cir. 1979). Discovery should be per-

mitted only where the respondent is able to distinguish himself from "the class of the ordinary [respondent]," *United States v. Fensterwald, supra,* 553 F.2d at 231–232, by citing special circumstances that raise doubts about the agency's good faith. Even then, district courts must limit discovery to the minimum necessary in the interests of justice by requiring specific interrogatories or affidavits rather than "full-dress discovery and trial." *United States v. Marine Midland Bank, supra,* 585 F.2d at 39; *see United States v. Fensterwald, supra,* 553 F.2d at 232–233.

 We conclude that the District Court acted within its discretion in denying Dresser discovery in this case, and that it properly granted judgment to the SEC on the record before it. There was nothing improper about the SEC's decision to transmit the files of the participants in the Voluntary Disclosure Program to Justice, or about the subsequent concurrent investigations by the two agencies. Nor does the participation of two SEC attorneys in the Justice task force cast doubt upon the good faith of the Commission. Dresser's allegations of an agreement by the SEC not to subpoena the documents underlying its voluntary report are not substantiated by any writing, and are directly contrary to the published terms of the Voluntary Disclosure Program.[53] Finally, Dresser's suggestion that the order of investigation is improper because there was no "likelihood that a violation has been or is about to be committed," *see* 17 C.F.R. § 202.5 (1979), does not distinguish Dresser from any other recalcitrant subpoena respondent. At this stage of the investigation neither this court nor the SEC could know whether Dresser has violated the law. The Commission's discretion concerning which potential violators to investigate is, while not unbounded, extremely broad. Dresser has suggested no improper motive for the SEC investigation, *cf. United States v. Fensterwald, supra,* 553 F.2d at 232 (respondent's political and pro-

---

**53.** Report, *supra* note 4, at 32; *see* text at note 8 *supra.*

fessional activities "could easily have spurred the Internal Revenue Service to take an extraordinary interest in this particular taxpayer"). Dresser's bare protestations of innocence do not suffice to call the SEC's bona fides into question.[54]. We therefore affirm the District Court's decision on this point.

Two remaining substantive issues raised by Dresser do not require decision by this court at this time. Those issues are: the asserted right of Dresser or its employees to protect portions of the documents from public disclosure because of the possibility of hostile and injurious foreign reaction, and the asserted attorney-client privilege of Dresser or its employees with respect to some of the documents. Despite Dresser's suggestion to the contrary, *see* brief of respondent-appellant at 42–47, we conclude that the District Court did not reach the merits of Dresser's claims on these points.

With respect to confidentiality, the court noted that the SEC had offered to give Dresser ten days notice in advance of disclosure of the documents to the public, to enable the company to challenge the decision to disclose. This offer the court found to be "adequate" to protect Dresser's interests at this stage of the proceeding. 453 F.Supp. at 576.[55] With respect to the attorney-client privilege, the District Court properly declined to evaluate Dresser's claims in generality, stating that such claims at this point are "vague and conclusory." *Id.* The court further said that "[c]ertainly not all of the material sought is privileged," and indicated that the investigative report prepared by Dresser as part of the Voluntary Disclosure Program is not privileged. *Id.* Dresser apparently does not dispute either

of these specific conclusions. Brief of respondent-appellant at 43, 44.

We agree with the District Court that Dresser's claims of confidentiality and of attorney-client privilege cannot be judged by the courts on this record at this stage of the proceeding. Rather, once the subpoena has been enforced the SEC will have the opportunity to rule on specific requests for confidential treatment and assertions of attorney-client privilege. This procedure will follow the outlines described by this court in *FTC v. Texaco, Inc.,* 55 F.2d 862, 883–885 (D.C.Cir.) *(en banc), cert. denied,* 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977), and the Supreme Court in *FCC v. Schreiber,* 381 U.S. 279, 290–291, 295–296, 85 S.Ct. 1459, 1467–1468, 1470, 14 L.Ed.2d 383 (1965).

We recognize that Judge Parker in the grand jury investigation of Dresser said that Dresser's concern for the lives of its employees and their families and property abroad in the event of public disclosure of portions of the documents is "not illusory and should not be lightly considered," *see* JA 163, but we believe that the SEC will be in a better position to evaluate this claim than the courts are now. This court has commented before that the danger that confidential materials might be wrongfully released to the public through the Freedom of Information Act is "by no means frivolous," *FTC v. Anderson, supra,* 631 F.2d at 748 n.11. Courts have held an offer of ten days notice before release of information to be adequate protection in several cases involving business information. *Id.,* 631 F.2d at 748; *FTC v. Texaco, Inc., supra,* 555 F.2d at 884–885; *SEC v. Wheeling-Pittsburgh Steel Corp.,* 482 F.Supp. 555,

---

**54.** Dresser's allegation that the staff "repeatedly told Dresser that it knew of no securities violation," brief of respondent-appellant at 41, does not alter the case. By the time the Commission decided to issue the order of investigation, the staff had officially concluded otherwise. *See* order directing private investigation and designating officers to take testimony, JA 7–9.

**55.** The court said:
Furthermore, the Commission has offered to give Dresser ten days notice in the event that

there is a FOIA request and the SEC determines the material is not exempt and must be disclosed. These assurances of confidentiality are adequate and Dresser is entitled to no more. * * *
453 F.Supp. at 576. We interpret the SEC's offer as encompassing any decision to release the documents, whether or not pursuant to the FOIA. Moreover, we assume that, upon examination of particular documents or groups of documents, the SEC has the authority to stiffen the confidentiality or notice agreement.

563 (W.D.Pa.1979). The District Court approved a similar arrangement in this case with respect to Dresser's subpoenaed documents in general. We do not read the opinion as approving such a procedure with respect to all documents in this case, no matter how sensitive they may prove to be. The decision whether to accord greater protection to certain documents where release might endanger employees' lives abroad must be made in the first instance by the Commission, which will be able to inspect the documents and hear argument on the issue.[56]

The question of the attorney-client privilege must be resolved in a similar manner: viewed initially by the Commission with later review in the courts if necessary.

We see no ground for reversal in the District Court's determinations on the confidentiality and attorney-client privilege issues.

The final issue in this case is that raised in No. 78–1705: whether the District Court erred in its decision of June 23, 1978, JA 532, *reconsideration denied*, JA 559, denying Mr. Edward R. Luter, a senior vice president of Dresser, the right to intervene in this enforcement proceeding on behalf of himself and other employees of Dresser. Mr. Luter claims an interest in the proceeding on bases of an alleged confidentiality interest on the part of the employees in certain documents and an alleged attorney-client privilege. The District Court rejected Mr. Luter's motion to intervene, saying:

> Mr. Luter has failed to demonstrate any proper basis for reconsideration, for intervention as a matter of right, or for intervention as a matter of discretion. Even if there was an attorney-client privilege to be invoked in this case, it would be the corporation's and not the employees'. In addition, the employees had no constitutional right of privacy concerning the communications in question. * * *

JA 559 (order denying reconsideration).

We are somewhat troubled by the District Court's treatment of Mr. Luter's motion. It appears that the court rejected his claim on the merits without first allowing him to pass the threshold. In this circuit an applicant to intervene need only show that the representation of his interest may be inadequate; the burden of proof rests on those resisting intervention. *Nuesse v. Camp*, 385 F.2d 694, 702 (D.C.Cir. 1967). In cases of alleged corporate misconduct it is especially important for the courts to be alert to the possibilities of conflict between the interests of the corporation and those of its employees.

In this case, however, we need not judge whether the court was correct in its conclusion that Mr. Luter has asserted no cognizable interest in the proceedings. With the benefit of hindsight, and informed by the arguments Mr. Luter has made on his behalf in this appeal, we are able to conclude that Dresser has adequately represented the interests of its employees through this stage of the litigation. So far, the disputes have centered on the enforceability of the SEC subpoena, not on particular questions of confidentiality or privilege pertaining to individual documents. We do not understand the District Court as having rejected the right of Mr. Luter or any other Dresser employees to intervene in future proceedings concerning this investigation. On the understanding that Mr. Luter or his fellow employees may seek to intervene in future SEC proceedings concerning confidentiality and the attorney-client privilege, and in any court proceedings that might follow, and that the SEC and the courts will evaluate any such motions to intervene afresh and on their merits, we affirm the judgment of the District Court in No. 78–1705. As previously indicated we affirm the judgment of the District Court in No. 78–1702 as well.

The judgments of the District Court are

*Affirmed.*

---

**56.** We note that, except in "egregious cases," the SEC has stated it would not require more than "generic" disclosure to the public of questionable foreign payments. Report, *supra* note 4, at 9 n.8.

EDWARDS, Circuit Judge, concurring:

I concur in the opinion of the court in this case. I wish to point out, however, that I do not read the court's opinion as expressing any view as to the proper outcome in a case of this sort *once an indictment has issued*. *See* text of opinion at notes 33–34, *supra*. Once an indictment has issued, the policy interest expressed in *United States v. LaSalle National Bank*, 437 U.S. 298, 312, 98 S.Ct. 2357, 2367, 57 L.Ed.2d 221 (1978), concerning the impermissibility of broadening the scope of criminal discovery through the summons authority of an agency, may come into play. I express no opinion as to whether or not the summons authority of a government agency may continue once an indictment has been issued or, if it may, whether protective conditions need be placed on the exercise of that power. These issues raise questions which are not presented here. The resolution of these questions, therefore, must await another day.